# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-3272

_____

|  |  |  |
|---|---|---|
| Jody Borgman, | * | |
| | * | |
| Plaintiff-Appellant, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the Southern |
| | * | District of Iowa. |
| Ryan Kedley; Wild Rose | * | |
| Clinton, L.L.C., | * | |
| | * | |
| Defendants-Appellees. | * | |
| | * | |

_____

Submitted: May 12, 2011
Filed: July 19, 2011

_____

Before MURPHY and COLLOTON, Circuit Judges, and ERICKSON,[1] District Judge.

_____

MURPHY, Circuit Judge.

Ryan Kedley, an agent of the Iowa Division of Criminal Investigation, arrested Jody Borgman for trespass when she entered the Wild Rose Casino after having signed two voluntary exclusion forms at the casino's predecessor establishment. After the charge against her was dropped, Borgman brought this

_____

[1]The Honorable Ralph R. Erickson, Chief Judge, United States District Court for the District of North Dakota, sitting by designation.

action against Kedley and the Wild Rose Casino, alleging violations of her constitutional rights under 42 U.S.C. § 1983 as well as state law claims for false arrest and imprisonment. The district court[2] granted summary judgment to Kedley and the casino, and Borgman appeals. We affirm.

I.

In October 2002, Borgman voluntarily barred herself from entering a river boat casino in Iowa named the Mississippi Belle II Casino (Mississippi Belle) by signing a lifetime self exclusion form. The Mississippi Belle had created the self exclusion form that was signed by Borgman to comply with an Iowa regulatory requirement that casinos "adopt and implement policies and procedures designed to . . . [a]llow persons to be voluntarily excluded for life from all facilities." Iowa Admin. Code r. 491-5.4(12). The regulations also required casinos to have "[p]rocedures for preventing reentry of problem gamblers." Id. The Mississippi Belle's voluntary exclusion form provided:

> I am barring myself from the Mississippi Belle II Casino, Clinton Ia. I understand that this barrment is irrevocable. I hereby release, indemnify and hold Mississippi Belle II Casino and it's [sic] agents, officers, directors and employees [harmless] from any claims, causes of action or liability of any kind arising from this request. . . . I further understand that if I am found on the properties of the Mississippi Belle II Casino, Clinton, Iowa, I may be considered a trespasser set out in Chapter 716.7 of the State Code of Iowa and subject to the penalties as provided by law.

Borgman returned to the Mississippi Belle casino on June 29, 2005, and won a jackpot for approximately $1,400. This attracted the attention of casino

---

[2] The Honorable Ross A. Walters, United States Magistrate Judge for the Southern District of Iowa, sitting by agreement of the parties under 28 U.S.C. § 636(c).

employees who approached Borgman and showed her signed 2002 self exclusion form to her. Borgman asked if she could undo the exclusion, and she was told that she could not. Casino employees asked her to sign a new self exclusion form in order to receive her winnings. She agreed to do so, received her jackpot, and left the premises. The new self exclusion form signed by Borgman generally included similar terms to the original form.

Despite the fact that the form required Borgman to certify that she had "taken the time to read and understand" its terms and agree that she was "legally bound" by it, Borgman testified that she had not actually read the new form before signing it. The form provided that if Borgman entered the casino, she "may be arrested and prosecuted for trespassing and other violations of criminal law." It also contained a release, which indicated that it applied to the casino and " all of its . . . assigns."

> I, for myself, my family members, heirs, and legal representatives hereby release and forever discharge the Casino and all of its . . . assigns . . . from any and all claims in law or equity that I now have or may have in the future against any or all of the Released Parties arising out of, or by reason of, the performance or non-performance of this Self-Exclusion Request, or any other matter relating to it . . . .

In 2006, the Wild Rose Clinton, L.L.C. purchased the assets and properties of the Mississippi Belle and assumed a number of its liabilities. The purchase agreement between the parties assigned to Wild Rose Clinton "[a]ll books, files, documents and records of any type, and in any format relating to the operation of the Business." The Wild Rose Clinton then closed the Mississippi Belle riverboat casino and reopened it as the Wild Rose Casino (Wild Rose) on land in June 2008.

The Wild Rose installed a new database system to record problem gamblers on a computerized list before reopening in June 2008, but it did not enter voluntary self exclusion forms like those Borgman had signed into that system until sometime between August and September 2008. The Wild Rose also created a

procedure for casino staff to follow when any banned individual entered the casino. Floor employees were to contact casino security personnel if a person on the computerized list tried to cash a check. Casino security was then to check the person's name against statewide and property specific trespass lists. If the name appeared on one of the lists, a casino manager was to approach her, properly identify her, and escort her to the security office to be readvised of her excluded status.

In August 2008, Borgman cashed several checks at the Wild Rose, but on those occasions she was not identified as an excluded person because the Wild Rose's database had not yet been fully updated. On September 26, 2008, Borgman attempted to cash another check at the casino. This time her name came up on the computerized list as a trespasser to the property. A security supervisor located the self exclusion forms Borgman had signed in 2002 and 2005 and approached her on the casino floor.

The security supervisor requested Borgman's license and, after confirming her identification, advised her that she was barred from the casino. He asked that she go with him to sign a form readvising her that she was barred from the casino. Borgman refused, stating that she had cashed checks there before and that she had not signed an exclusion form for the Wild Rose. The security supervisor told her that the Mississippi Belle exclusion carried over and applied to the Wild Rose. He again asked her to sign a readvisement form, and Borgman again refused.

The security supervisor used a radio to call Kedley about the incident with Borgman. Kedley was an agent of the Iowa Division of Criminal Investigation who was stationed at the casino by the state; he was not a casino employee. Kedley went out on the casino floor where he was briefed on what had occurred and given the 2005 self exclusion form previously signed by Borgman. Security staff had previously informed him that the forms were applicable at the new casino.

After Kedley was briefed on the situation, he asked Borgman to sign a readvisement form or be faced with an arrest for trespass. Because she had been excluded from the casino, Kedley testified that he told her that "[h]er options were to accompany [him] to sign a re-advisement form . . . or she would be charged with criminal trespass." Borgman asked that he return her license and checks instead. She said that she would leave the casino and not come back. Kedley told her that he could not let her go, saying "right now you're breaking the law, ma'am, because you are on a property that you're not supposed to be at." When she again refused to sign the form, he asked her to accompany him outside, where he placed her under arrest for trespassing and interference with official acts. Borgman was taken to jail and stayed there for about two hours until she made bail. She was charged with a simple misdemeanor for criminal trespass in violation of Iowa Code § 716.7. The county attorney dismissed the charge before the case went to trial.

Borgman filed this action against agent Kedley and the Wild Rose Clinton, alleging that they both had violated her First, Fourth, and Fourteenth Amendment rights under 42 U.S.C. § 1983 when they acted in concert to have her arrested without probable cause. Borgman also claimed that both Kedley and the Wild Rose violated state law by falsely arresting and imprisoning her. The district court determined that Borgman had abandoned her false arrest and imprisonment claim against Kedley, a conclusion that she does not appeal.

The district court granted summary judgment in favor of Kedley and the Wild Rose, concluding that Kedley was entitled to qualified immunity because he had an objectively reasonable belief that Borgman was trespassing and that the Wild Rose had been released from any liability. Borgman appeals, arguing that Kedley is not entitled to qualified immunity for his Fourth and Fourteenth Amendment violations and that the Wild Rose was not released from liability.

II.

Borgman appeals the district court's determination that Kedley was entitled to qualified immunity for her Fourth and Fourteenth Amendment claims. We review de novo a grant of summary judgment on the basis of qualified immunity, viewing the evidence in the light most favorable to Borgman. Amrine v. Brooks et al., 522 F.3d 823, 830–31 (8th Cir. 2008).

Qualified immunity protects police officers from civil liability for any action that does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Young v. Selk, 508 F.3d 868, 871 (8th Cir. 2007) (citation omitted). The immunity allows "officers to make reasonable errors," Habiger v. City of Fargo et al., 80 F.3d 289, 295 (8th Cir. 1996), and provides "ample room for mistaken judgments." Malley v. Briggs, 475 U.S. 335, 343 (1986). The defense protects public officials unless they are "plainly incompetent" or "knowingly violate the law." Hunter v. Byrant, 502 U.S. 224, 229 (1991) (citation omitted). When determining whether a state official is entitled to qualified immunity, we decide whether the alleged facts demonstrate that his conduct violated a constitutional right and whether that right was clearly established at the time of the violation. See Saucier v. Katz, 533 U.S. 194, 201 (2001). The court has discretion to decide which element of the qualified immunity defense to address first. Pearson v. Callahan, 129 S. Ct. 808, 818 (2009).

A warrantless arrest is consistent with the Fourth Amendment if it is supported by probable cause, and an officer is entitled to qualified immunity if there is at least "arguable probable cause." Walker v. City of Pine Bluff, 414 F.3d 989, 992 (8th Cir. 2005) (citation omitted). An officer has probable cause to make a warrantless arrest when the totality of the circumstances at the time of the arrest "are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense." Fisher v. Wal-Mart Stores, Inc. et al., 619

F.3d 811, 816 (8th Cir. 2010) (citation omitted). Arguable probable cause exists even where an officer mistakenly arrests a suspect believing it is based in probable cause if the mistake is "objectively reasonable." Amrine, 522 F.3d at 832.

Borgman was arrested for criminal trespass. Under Iowa law, a person commits criminal trespass if she enters the property of another after being notified or requested not to enter the property. Iowa Code § 716.7(2)(b). Kedley can only make out his qualified immunity defense if he can show that a reasonable officer could have had arguable probable cause that Borgman was improperly on the property of the Wild Rose and that she knew it. Amrine, 522 F.3d at 832. The district court determined that arguable probable cause existed. It concluded that "[r]easonable persons in Agent Kedley's position could both believe or not believe that Ms. Borgman knowingly committed the crime of trespass."

We conclude that the district court did not err in determining that a reasonable officer could have believed that Borgman was barred from the Wild Rose. He was entitled to rely on what he was told by casino security. Officers may "rely on the veracity of information supplied by the victim of a crime. . . ." Fisher, 619 F.3d at 817 (citation omitted); see Granito v. Tiska et al., 120 F. App'x 847, 849 (2d Cir. 2005). Arguable probable cause in a trespassing case may be based at least in part on explanations given by internal security officers, such as the security supervisor at the Wild Rose. Blankenhorn v. City of Orange et al., 485 F.3d 463, 475 (9th Cir. 2007). In considering information given by a victim of a crime, an officer need not conduct a "mini-trial" before effectuating an arrest although he cannot avoid "minimal further investigation" if it would have exonerated the suspect. Kuehl v. Burtis et al., 173 F.3d 646, 650 (8th Cir. 1999) (citations omitted). Thus, there was no arguable probable cause in Kuehl because the officer there had spoken with the suspect for only twenty seconds, ignored exculpatory evidence, and disregarded an eyewitness account. Id. When an officer is faced with conflicting information that cannot be immediately resolved,

however, he may have arguable probable cause to arrest a suspect. Amrine, 522 F.3d at 832–33.

Here, the undisputed facts show that the Wild Rose had alerted Kedley that Borgman was barred from the property and was not cooperating with casino security officers. Casino personnel told Kedley that Borgman had signed two self exclusion forms with the Mississippi Belle and that the forms applied to the Wild Rose as a successor casino. A reasonable officer would be entitled to rely on the representations made by the casino personnel and could infer from the circumstances that the self exclusion form was applicable. He would not have been required to conduct a "mini-trial" before placing Borgman under arrest as it would have taken more than "minimal further investigation" to sort out any inconsistencies between the statements by casino security personnel and Borgman. See Amrine, 522 F.3d at 832–33. And even if a reasonable officer would have done additional investigation, the 2005 self exclusion form could have reasonably been understood to bar Borgman from the Wild Rose because it represented that Borgman would not "attempt to gain access to this Casino" and referenced its "assigns," which would include the Wild Rose under the terms of the purchase agreement between the Mississippi Belle and Wild Rose Clinton.

The district court did not err by concluding that a reasonable officer could have determined that Borgman knew that she was not permitted to be at the Wild Rose. An officer can rely on "the implications of the information known to him" when assessing whether a suspect possessed the state of mind required for the crime. Krause v. Bennett, 887 F.2d 362, 371 (2d Cir. 1989). It is usually not possible for an officer to be certain about a suspect's state of mind at the time of a criminal act, id.; see also Floyd v. Farrell, 765 F.2d 1, 5–6 (1st Cir. 1985), but he need not rely on an explanation given by the suspect. Wright v. City of Philadelphia et al., 409 F.3d 595, 603 (3d Cir. 2005) (explanation by the subject of the investigation not dispositive on whether a reasonable officer would have believed that an actionable trespass was occurring). Moreover, a suspect's

subjective belief that she is not violating the law may be "irrelevant to [the] qualified immunity analysis." Hutton v. Strickland, 919 F.2d 1531, 1540 (11th Cir. 1990).

The fact that the Wild Rose was an assign of the Mississippi Belle was known to the security personnel and agents working at the casino, and a reasonable officer could have inferred broader public knowledge of that relationship. It would be particularly reasonable for an officer to assume that Borgman would have known that she was not allowed at the Wild Rose after he had been alerted that she had signed not one, but two forms barring herself from casino premises. That Borgman repeatedly told the casino staff and Kedley that she did not know that the exclusion forms carried over to the Wild Rose is not determinative. Viewing the facts in the light most favorable to Borgman means only that the court must accept that she emphatically denied knowing that she was trespassing, but it does not mean that a reasonable officer would have believed her. As far as Kedley knew from what he had been told by casino personnel, Borgman had voluntarily signed two exclusion forms that barred her from the premises. We conclude that arguable probable cause existed for Kedley to arrest Borgman for trespass.

Borgman argues that Kedley is not entitled to qualified immunity on her Fourth Amendment claim because his actual motivation for arresting her was that she refused to sign the readvisement form, not that he believed that she was trespassing. Kedley testified, however, that he told Borgman that "right now you're breaking the law, ma'am, because you're on a property that you are not supposed to be at," which supports that he arrested her for trespass. In any event, Kedley's subjective motivations in arresting Borgman are irrelevant to the qualified immunity analysis. Devenpeck v. Alford, 543 U.S. 146, 153 (2004); McCabe v. Parker et al., 608 F.3d 1068, 1077–78 (8th Cir. 2010). For that reason, even if Kedley had been subjectively motivated to arrest her for refusing to sign the readvisement form, it would not affect the arguable probable cause analysis.

Borgman also contends the district court ignored her claim that Kedley violated her clearly established Fourteenth Amendment right to contract by giving her an ultimatum that she either sign the readvisement form or face arrest. Borgman argues that Kedley violated her Fourteenth Amendment rights by attempting to coerce her into signing a contract with the Wild Rose. See Bd. of Regents v. Roth, 408 U.S. 564, 572 (1972) (the right to contract is protected by the Fourteenth Amendment). In support of this claim, Borgman relies on Kedley's testimony that he told her that "[h]er options were to accompany [him] to sign a re-advisement form . . . . or she would be charged with criminal trespass."

Borgman has not established that the right to contract which she asserts was clearly established at the time of her arrest. See Saucier, 533 U.S. at 201. That inquiry is fact intensive and must be "undertaken in light of the specific context of the case, not as a broad general proposition." Samuelson v. City of New Ulm et al., 455 F.3d 871, 875 (8th Cir. 2006) (citations omitted). Borgman relies only on Grosch v. Tunica Cnty., No. 2:06CV204-P-A, 2008 WL 114773, at *8 (N.D. Miss. Jan. 8, 2008), and Bacquie et al. v. City of New York, No. 99 Civ. 10951, 2000 WL 1051904, at *1-3 (S.D.N.Y. July 31, 2000), to meet her burden. These cases are inapplicable because they do not discuss the right to contract, but rather focus on whether qualified immunity existed in the context of either an unreasonable seizure or a false arrest.

In any event, no right to contract was implicated here because Borgman cannot show that the readvisement form that casino personnel and Kedley asked her to sign was a contract that would have created obligations for the casino and Borgman. See Compiano v. Kuntz, 226 N.W.2d 245, 249 (Iowa 1975). Indeed, Borgman had already signed two forms that instructed the casino that she was to be permanently excluded from the property and allowed for her arrest if she chose to reenter. Kedley's request that Borgman sign a readvisement form complied with the regulatory requirement that casinos have procedures that "prevent . . . [the] reentry of problem gamblers." Iowa Admin. Code r. 491-5.4(12). Because

-10-

Borgman has not shown that the readvisement form would have altered the parties' obligations or that the Kedley's request that she sign it was improper under applicable regulations, she cannot sustain her Fourteenth Amendment claim.

Since the record evidence supports the conclusion that Kedley arrested Borgman for trespassing on casino property, we conclude that the district court did not err in finding that Kedley was entitled to qualified immunity.

III.

Borgman also appeals the district court's grant of summary judgment to the Wild Rose on her claims that the casino had acted in concert to arrest her without probable cause and arrest and falsely imprison her. The district court granted summary judgment to the Wild Rose because the 2005 self exclusion form released the casino from liability. The form released the Mississippi Belle casino as well as its "assigns" from "any and all [present or future] claims . . . arising out of, or by reason of, the performance or non-performance of this Self-Exclusion Request, or any other matter relating to it . . . ." The 2005 form was assigned to the Wild Rose as part of the acquisition.

Releases are valid and enforceable contracts under Iowa law. See Grabill v. Adams Cnty. Fair & Racing Ass'n, 666 N.W.2d 592, 596 (Iowa 2003). Iowa courts routinely permit a party to release future assigns. Id. at 595; Huber v. Hovey et al., 501 N.W.2d 53, 54 (Iowa 1993). Wild Rose qualifies as an "assign" under the 2005 form because the relevant agreements assigned certain assets and liabilities from the Mississippi Belle to the Wild Rose, including this property specific exclusion form.

Borgman argues that the release was signed under coercion, lacked consideration, and could not be enforced. She first argues that the release was not valid because she had not read the form before signing it. Under Iowa law,

however, "failure to read a contract before signing it will not invalidate the contract." Huber, 501 N.W.2d at 55. Because Borgman has alleged neither fraud nor mistake, her failure to read the release does not negate its effect. See id.

She also contends that she was coerced into signing the release because the casino would not give her the approximately $1,400 in jackpot winnings she had won until she signed the new self exclusion form and release. This argument also fails. The casino was not required to pay Borgman the jackpot because she was already an excluded person as a result of her 2002 self exclusion. See Blackford v. Prairie Meadows Racetrack & Casino, Inc., 778 N.W.2d 184, 189–90 (Iowa 2010). Moreover, Borgman had a reasonable alternative. She could forgo the jackpot to which she was not legally entitled or sign the exclusion and release. She chose the latter.

Borgman next argues that the release was not supported by consideration. Under Iowa law, there is a general presumption that a "written and signed agreement is supported by consideration." Margeson v. Artis et al., 776 N.W.2d 652, 656 (Iowa 2009). Borgman has not presented anything to overcome that presumption. It is undisputed that the casino gave Borgman the jackpot, to which she was not otherwise legally entitled, in exchange for signing the exclusion and release. This was a benefit to Borgman that satisfies the consideration requirement. See Hubbard Milling Co. v. Citizens State Bank, 385 N.W.2d 255, 258 (Iowa 1986).

Finally, Borgman argues that the Wild Rose should have been estopped from enforcing the release because she had cashed checks at the casino twice before she was stopped by the security staff. The parties agree that the excluded persons list was not added to the casino database until between August and September 2008. The first time Borgman attempted to cash a check after the database was updated, security personnel stopped her and she was confronted by a security supervisor. Under Iowa law estoppel or abandonment of a contract can only occur upon an

-12-

"unequivocal and decisive" act evidencing a party's intention to abandon. <u>Iowa Glass Depot, Inc. v. Jindrich</u>, 338 N.W.2d 376, 380 (Iowa 1983). Wild Rose did not unequivocally and decisively relinquish its rights under the release. The release contained in the 2005 form was therefore valid and enforceable, and it absolved the Wild Rose of any liability from Borgman's constitutional and state law claims.

For the foregoing reasons we affirm the judgment of the district court.

_____