# United States Court of Appeals
## For the Eighth Circuit

_____

No. 11-3065
_____

Timothy Galarnyk

*Plaintiff - Appellant*

v.

Tom Fraser

*Defendant - Appellee*

Mike Martin; Unknown Supervisor of Tom Fraser; Unknown Minneapolis Police Officers; Unknown Minnesota State Patrol/Troopers; and City of Minneapolis

*Defendants*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: May 16, 2012
Filed: August 7, 2012

_____

Before RILEY, Chief Judge, MELLOY and SMITH, Circuit Judges.

_____

RILEY, Chief Judge.

On August 9, 2007, Minnesota State Patrol (MSP) Captain Thomas Fraser detained Timothy Galarnyk at the site of the collapse of the I-35W bridge in Minneapolis, Minnesota. Galarnyk appeals the district court's[1] adverse grant of summary judgment on Galarnyk's 42 U.S.C. § 1983 false arrest and First Amendment retaliatory arrest claims against Captain Fraser. We affirm.

## I.    BACKGROUND

On August 1, 2007, the I-35W bridge in Minneapolis, Minnesota, tragically collapsed into the Mississippi River. Several federal and state agencies responded, including the United States Occupational Safety and Health Administration (OSHA), the National Transportation Safety Board (NTSB), the Minnesota Occupational Safety and Health Administration (MnOSHA), and the Minnesota Department of Transportation (MnDOT). The MSP assigned Major Michael Asleson, Captain Fraser, and others to provide safety and security at the site.

Galarnyk, an experienced bridge and construction safety consultant, is the chief executive officer of Construction Risk Management, Inc. (CRM), a private consulting company. The day the bridge collapsed, Galarnyk discussed the cause of the collapse on a local broadcast of a FOX News affiliate. On August 2, 2007, Galarnyk again appeared on media outlets such as CBS and FOX News, criticizing MnDOT's inspections of the bridge before the collapse. Galarnyk later appeared on CNN, FOX News national (Geraldo at Large), and Al Jazeera.

Later on August 2, 2007, Galarnyk went to the collapse site, wearing a hard hat and a reflective vest identifying CRM. Galarnyk had no official purpose at the site,

---

[1]The Honorable John R. Tunheim, United States District Judge for the District of Minnesota.

but was curious and thought he could help. Galarnyk was also concerned about a possible cover-up by MnDOT.

On Galarnyk's first visit to the collapse site, the emergency command center was not secure. Galarnyk went to the command center and mingled with officials from several agencies. Galarnyk met Captain Fraser there, advised him of his expertise and safety concerns, and gave him his CRM business card. Major Asleson and Mark Hysell, OSHA Director for the Northwest area of Wisconsin, also indicated they spoke with Galarnyk about his reason for being at the site that day.

After Galarnyk's first visit, law enforcement officers relocated the command center and secured the collapse site and command center with a fence and a manned entry gate. Law enforcement officers treated the collapse site like a crime scene because of the loss of life and the ongoing investigation.

On August 8, 2007, Galarnyk contacted the NTSB to ask about the investigation. Galarnyk states an NTSB hotline operator asked Galarnyk to come to the site the next day at 10:00 a.m. to meet with Dan Walsh, a senior NTSB investigator. When Galarnyk arrived at the site on August 9, 2007, the MnDOT official manning the entry gate allowed Galarnyk into the secure area and directed him to the trailer occupied by the NTSB and MnDOT (NTSB trailer). A second trailer at the command center was occupied by OSHA and MnOSHA on one end and MSP on the other, with a conference room between them.

Galarnyk estimates he spoke with Walsh for no more than twenty minutes. After leaving the NTSB trailer, Galarnyk, without authorization, entered the OSHA trailer to find out who was in charge of safety at the site. Once inside, Galarnyk interrupted a safety meeting involving Sandra Taylor, Deputy Regional Administrator for OSHA with responsibility for safety and health management activities for Minnesota; Julie Libonate, a MnDOT Safety Supervisor; and a private contractor.

-3-

Having entered the doorway to the conference room where the meeting was taking place, Galarnyk interjected his unsolicited opinions into the discussion and criticized the meeting's participants—"two gals"—because he believed they had "not nar' one clue" about safety. When Galarnyk disrupted the private meeting, Taylor and the private contractor asked Galarnyk to identify himself.

As Galarnyk responded, Hysell, who knew Galarnyk before the collapse, entered the OSHA trailer and joined the discussion. At his deposition, Galarnyk recounted the following exchange with Hysell:

Hysell: What are you doing here Galarnyk?

Galarnyk: I'm just asking—listening to this thing, and I can't believe that these people would be asking if they could violate the federal law.

. . . .

Hysell: You don't belong here.

Galarnyk: Well, that's fine. I'm going to leave.

. . . .

Hysell: [Y]ou don't belong here and you've got to get out of here.

Galarnyk: [Hysell], somebody's got to watch safety because apparently you're not. To allow [the private contractor] to ask—even ask that [safety] question is absurd. You want somebody else to get killed on this job or haven't you had enough?

Hysell: I think you should leave.

Galarnyk: That's fine.

-4-

Galarnyk then left. Galarnyk maintains the entire chain of events took no more than ninety seconds and he left the OSHA trailer the first time he was asked. Citing the recorded interview transcript, Captain Fraser emphasizes that in Galarnyk's contemporaneous interview with the police, Galarnyk stated he was asked to leave by the private contractor, a female OSHA employee, and Hysell before he finally left. In affidavits submitted in support of summary judgment, Taylor and Libonate averred Galarnyk became confrontational and argumentative and was repeatedly asked to leave.

While Hysell and Taylor spoke with Galarnyk, Libonate went to the MSP command center to request assistance removing Galarnyk from the meeting. Captain Fraser and Major Asleson were in the MSP command center when Libonate reported "[W]e need your help here. We have a situation. We have a man who is not supposed to be here and he won't leave."

Captain Fraser left the command center to enter the OSHA side of the trailer, but Galarnyk had already left the trailer and was walking to his car. When Captain Fraser reached Galarnyk's car, Galarnyk was already pulling away. Captain Fraser knocked on the window and directed Galarnyk to park his car and exit so Captain Fraser could speak with him. Galarnyk complied and told Captain Fraser and Major Asleson, who had joined them, that Galarnyk had a right to be in the area to meet with the NTSB. Galarnyk maintains Captain Fraser and Major Asleson were aware he was on site to meet with the NTSB because they had seen him arrive for the meeting.

Major Asleson then told Captain Fraser that he had previously told Galarnyk to leave the secure area and not return. Galarnyk contends neither Major Asleson nor anyone else ever told Galarnyk he was not "welcome and invited to be in the area" until Hysell asked him "to leave the OSHA trailer only, not the entire site." According to Galarnyk, when Major Asleson told Galarnyk, "We told you never to

come back here and stay away from this site," Galarnyk replied, "I don't even know who you are. I have never seen you before in my entire life."

Galarnyk recalls Captain Fraser then asked Major Asleson, "Do you know who that guy is? He was on Geraldo. We've got to keep him locked up in a deep, dark room so he doesn't get any more information as long as we can." Major Asleson advised Galarnyk they were going to detain him and directed Captain Fraser to escort Galarnyk to the Minneapolis Police Department (MPD) command post. As Captain Fraser did so, Galarnyk called his contact at FOX News, Geraldo Rivera's brother Craig, and told him the police were arresting Galarnyk to prevent him from speaking to Geraldo.

Captain Fraser did not tell Galarnyk he was under arrest, take his keys, or handcuff him. Captain Fraser took Galarnyk by the arm to lead him to the MPD command post, but let go when Galarnyk did not resist. Galarnyk asked Captain Fraser what would happen if he did not follow him to the MPD command post. Captain Fraser replied Galarnyk "probably wouldn't like the answer." Galarnyk complied.

Galarnyk asserts when Captain Fraser turned him over to the MPD, Captain Fraser repeated his statement about keeping Galarnyk locked up because he was providing information about the bridge collapse to Geraldo. An MPD officer handcuffed Galarnyk, searched him, placed him in a squad car and transported him to the police department where an MPD officer interviewed Galarnyk before putting him in a jail cell. Galarnyk was released later that night. No criminal charges were filed.

Galarnyk sued Captain Fraser and others asserting, among other things, false arrest and First Amendment retaliatory arrest claims. Captain Fraser moved for

-6-

summary judgment, which the district court granted. Galarnyk appeals the adverse grant of judgment on his constitutional claims against Captain Fraser.

## II.    DISCUSSION

### A.    Standard of Review

"We review the district court's grant of summary judgment *de novo*, viewing the record in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor." Chambers v. Pennycook, 641 F.3d 898, 904 (8th Cir. 2011). Summary judgment is required "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

### B.    False Arrest

Galarnyk contends the district court erred in concluding Captain Fraser (1) did not cause Galarnyk's arrest, and (2) was entitled to qualified immunity because Captain Fraser had probable cause to arrest Galarnyk. Captain Fraser responds it makes no difference "whether Fraser's interaction with Galarnyk constituted an investigative stop, the cause of Galarnyk's arrest, or an actual arrest" because Captain Fraser "had probable cause or arguable probable cause" to arrest Galarnyk for trespass. We agree.

"Qualified immunity shields government officials from federal suit unless their conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." Anderson v. Larson, 327 F.3d 762, 769 (8th Cir. 2003) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).

> A warrantless arrest is reasonable under the Fourth Amendment where it is supported by probable cause. See Devenpeck v. Alford, 543 U.S. 146, 152 (2004). Probable cause exists when the facts and circumstances within an officer's knowledge are sufficient to lead a person of reasonable caution to believe that the suspect has committed

-7-

or is committing a crime. Brinegar v. United States, 338 U.S. 160, 175-76 (1949). In a claim for damages, officers are "entitled to qualified immunity if they arrest a suspect under the mistaken belief that they have probable cause to do so, provided that the mistake is objectively reasonable"—that is, officers are not liable if they had "arguable probable cause" to make the arrest. Amrine v. Brooks, 522 F.3d 823, 832 (8th Cir. 2008).

Bernini v. City of St. Paul, 665 F.3d 997, 1003 (8th Cir. 2012), petition for cert. filed, ___ U.S.L.W. ___ (U.S. June 6, 2012) (No. 11-1490).

Here, the undisputed facts and circumstances presented to Captain Fraser when he encountered Galarnyk at the restricted collapse site provided probable cause to arrest Galarnyk for trespass under Minnesota law. See Green v. Nocciero, 676 F.3d 748, 751-52 (8th Cir. 2012) (concluding arresting officers who reasonably relied on information indicating a civil rights activist was disruptive and refused to leave a public meeting when requested were entitled to qualified immunity because the information, even if inaccurate, provided probable cause to arrest the activist for trespass under Missouri state law); State v. Occhino, 572 N.W.2d 316, 319 (Minn. Ct. App. 1997) (explaining "[a] disruptive and hostile individual [who lawfully entered a government facility had] no legal right to remain on the premises after being ordered to leave" and could be arrested for trespass). Under Minn. Stat. § 609.605, subd. 1(b)(3), "[a] person is guilty of a misdemeanor if the person intentionally . . . trespasses on the premises of another and, without claim of right, refuses to depart from the premises on demand of the lawful possessor."[2]

---

[2] Captain Fraser also asserts the information from Major Asleson provided probable cause to believe Galarnyk violated Minn. Stat. § 609.605, subd. 1(b)(8), which states a person trespasses if he intentionally "returns to the property of another within one year after being told to leave the property and not to return, if the actor is without claim of right to the property or consent of one with authority to consent." We need not address this assertion directly.

-8-

Although Galarnyk presumably was authorized to enter the restricted collapse site for the limited purpose of meeting with the NTSB, Galarnyk did not leave the site when that purpose ended. Instead, Galarnyk admittedly entered the OSHA trailer—without invitation or permission—and interrupted an ongoing private safety meeting, "chid[ing] the OSHA employees for their lax safety policies." Even if we accept Galarnyk's statement he left the OSHA trailer the first time he was asked, and grant all reasonable inferences in Galarnyk's favor, Captain Fraser, based on the undisputed facts known to him at the time, reasonably could have believed Galarnyk was trespassing in a restricted area.

Captain Fraser was entitled to rely on Libonate's credible report that Galarnyk was not supposed to be in a restricted area and refused to leave. See Borgman v. Kedley, 646 F.3d 518, 523 (8th Cir. 2011) ("Officers may 'rely on the veracity of information supplied by the victim of a crime.'" (quoting Fisher v. Wal-Mart Stores, Inc., 619 F.3d 811, 817 (8th Cir. 2010))). Likewise, Captain Fraser could reasonably credit Major Asleson's statement that he had previously ordered Galarnyk not to return to the collapse site.

Galarnyk maintains no one previously ever told him to stay away from the site, and on August 9, he left when asked. But the accuracy of the information Captain Fraser received from Libonate and Major Asleson is not determinative in evaluating whether probable cause existed at the time of Galarnyk's purported arrest. See Green, 676 F.3d at 751-52; cf. Borgman, 646 F.3d at 522 (explaining qualified immunity "provides 'ample room for mistaken judgments'" and reasonable errors) (quoting Malley v. Briggs, 475 U.S. 335, 343 (1986)).

Galarnyk himself testified Major Asleson advised Captain Fraser that Major Asleson warned Galarnyk not to return to the collapse site. Galarnyk vehemently denied the accusation, but Captain Fraser could reasonably rely on Major Asleson's statement despite Galarnyk's denial. See Borgman, 646 F.3d at 524 (explaining an

officer "need not rely on an explanation given by the suspect"). An officer "faced with conflicting information that cannot be immediately resolved" may still have probable cause and "need not conduct a 'mini-trial' before effectuating an arrest." Id. at 523 (quoting Kuehl v. Burtis, 173 F.3d 646, 650 (8th Cir. 1999)). Because Galarnyk's presence at the restricted site and Libonate's and Major Asleson's ostensibly credible statements established probable cause to arrest Galarnyk for trespass, Galarnyk's false arrest claim fails. See Anderson, 327 F.3d at 770 ("A claim of false arrest brought pursuant to § 1983 fails if the officer had probable cause to make the arrest.").

We also reject Galarnyk's contention that Captain Fraser was not entitled to qualified immunity on Galarnyk's false arrest claim because Captain Fraser (1) never articulated trespass as the basis for detaining Galarnyk, and (2) "actually arrested [Galarnyk] out of retaliation for Galarnyk's protected speech activities."

> [A]n arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause. That is to say, his subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause.

Devenpeck, 543 U.S. at 153 (internal citations omitted). The district court did not err in "find[ing] no constitutional violation in Galarnyk's arrest." "The Fourth Amendment's concern with reasonableness allows certain actions to be taken in certain circumstances, *whatever* the subjective intent." Id. (quoting Whren v. United States, 517 U.S. 806, 814 (1996)) (internal marks omitted).

### C.   First Amendment Retaliatory Arrest

That Captain Fraser had probable cause to arrest Galarnyk for trespass is also fatal to Galarnyk's First Amendment retaliatory arrest claim. See McCabe v. Parker, 608 F.3d 1068, 1075 (8th Cir. 2010). In McCabe, we held the "[l]ack of probable cause is a necessary element of" a First Amendment retaliatory arrest claim. Id.

In <u>Reichle v. Howards</u>, ___ U.S. ___, ___ , 132 S. Ct. 2088, 2091, 2093 (2012), the Supreme Court determined "two federal law enforcement agents [were] immune from suit for allegedly arresting a suspect in retaliation for his political speech, when the agents had probable cause to arrest the suspect for committing a federal crime." The Supreme Court concluded "that, at the time of [the defendant's] arrest [in 2006], it was not clearly established that an arrest supported by probable cause could violate the First Amendment." <u>Id.</u> at ___ , 132 S. Ct. at 2093. The Supreme Court declined to decide "whether a First Amendment retaliatory arrest claim may lie despite the presence of probable cause to support the arrest,"[3] <u>id.</u>, leaving our conclusion in <u>McCabe</u> intact. Accordingly, the district court did not err in holding the presence of probable cause to arrest Galarnyk for trespass defeated Galarnyk's First Amendment retaliatory arrest claim.

## III.   CONCLUSION

We affirm.

_____

[3]The Supreme Court reasoned in <u>Reichle</u> that it had "never recognized a First Amendment right to be free from a retaliatory arrest that is supported by probable cause." <u>Id.</u>