# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued March 18, 2015        Decided August 25, 2015

No. 13-7150

SAMUEL DUKORE AND KELLY CANAVAN,
APPELLANTS

v.

DISTRICT OF COLUMBIA, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:12-cv-00409)

*Jeffrey Light* argued the cause and filed the briefs for appellants.

*Stacy L. Anderson*, Senior Assistant Attorney General, Office of the Attorney General for the District of Columbia, argued the cause for appellees. With her on the brief were *Irvin B. Nathan*, Attorney General at the time the brief was filed, *Todd S. Kim*, Solicitor General, and *Loren L. AliKhan*, Deputy Solicitor General.

Before: TATEL and MILLETT, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

MILLETT, *Circuit Judge*: The "Occupy Movement" claims as its purpose the exposure of "how the wealthiest 1% of society are promulgating an unfair global economy[.]" Second Amended Complaint ¶ 11. A "core component" of the movement's message is "peaceful protests, or 'occupations'" accomplished through the "physical occupation" of public spaces, which is "expressed through the establishment of tents." *Id.* ¶ 14.

In the District of Columbia, however, a municipal regulation forbids any person from "set[ting] up, maintain[ing], or establish[ing] any camp or any temporary place of abode in any tent" on public property without the Mayor's authorization. D.C. Code. Mun. Regs. Title 24, § 121.1. Occupy members Samuel Dukore and Kelly Canavan were arrested for violating that regulation when, late one February evening, they assembled and sat inside an Occupy tent on a sidewalk by Merrill Lynch's office in Washington, D.C. Dukore and Canavan then sued, alleging that their arrests violated their rights under the federal Constitution and District law. Because their arrests did not violate clearly established law, we affirm the district court's dismissal of their complaint.

# I

## Statutory and Regulatory Background

A District of Columbia municipal regulation provides that:

No person or persons shall set up, maintain, or establish any camp or any temporary place of abode in any tent, wagon, van, automobile, truck, or house trailer, of any

description, or in any combination, on public or private property, without the consent of the Mayor of the District of Columbia.

D.C. Code. Mun. Regs. Title 24, § 121.1.

The District's First Amendment Assemblies Act provides, as relevant here, that "individuals conducting a First Amendment assembly * * * may use a stand or structure so long as it does not prevent others from using the sidewalk." D.C. Code § 5-331.05(g). The Assemblies Act cautions, however, that assemblies and protests may be subject to "reasonable time, place, and manner restrictions[.]" D.C. Code § 5-331.04(b).

## Factual Background

Because the district court dismissed the complaint for failure to state a claim, we must accept as true the following facts as alleged in the Second Amended Complaint ("Complaint"). *See Klayman v. Zuckerberg*, 753 F.3d 1354, 1357 (D.C. Cir. 2014).

On the evening of February 13, 2012, Dukore and Canavan joined with a group of fewer than fifty protesters and set up tents on the sidewalk outside Merrill Lynch's Washington, D.C., office to "express Plaintiffs' statement of the 99% taking back society and government from the grip of banking and financial institutions[.]" Complaint ¶ 20. The tents, which "clearly identified the protest as part of Occupy DC," did not prevent others from using the sidewalk. *Id.* Some time after the protesters had set up their tents, officers from the Metropolitan Police Department instructed them to remove their tents or face arrest. *Id.* ¶ 24. The officers

repeated that directive about forty-five minutes later, at which point the protesters took down all of the tents. *Id.* ¶ 25.

But Dukore and Canavan then reassembled one of the tents and sat down inside of it. Complaint ¶ 26. There was "no visible sleeping/living equipment inside or around the tent[.]" *Id.* ¶ 28. After three warnings, the police arrested Dukore and Canavan for violating the regulation against setting up a temporary abode on public grounds. *Id.* ¶ 26. The arrest occurred "at approximately 10:44 p.m." Dukore Br. 14 n.8; *see also* District Br. 24. Dukore and Canavan were released "approximately 3-4 hours later," and the charges were subsequently "no-papered" (that is, dropped). Complaint ¶ 26. The tent was seized, and Dukore and Canavan were not told how they could retrieve it. *Id.* ¶ 27. They believe that the tent was destroyed. *Id.*

**Procedural History**

Dukore and Canavan filed suit in the United States District Court for the District of Columbia alleging (i) false arrest and false imprisonment under District of Columbia law, (ii) wrongful conversion of their tent, (iii) retaliatory arrest in violation of the First Amendment, (iv) arrest without probable cause in violation of the Fourth Amendment, and (v) deprivation of their tent without due process, in violation of the Fifth Amendment. Complaint ¶¶ 37–60. The Complaint named as defendants the District of Columbia, several police officers, and an Inspector at the District's Department of Consumer and Regulatory Affairs, who allegedly advised the officers on the scene of the applicability of the temporary-abode regulation (collectively, "the District"). Complaint ¶¶ 3–6.

The district court granted the District's motion to dismiss. It concluded that Dukore and Canavan had failed to state a

claim for false arrest or imprisonment, or for the alleged Fifth Amendment violation, and that the individual defendants were entitled to qualified immunity on the First and Fourth Amendment claims. The court dismissed all of those counts with prejudice. *See Dukore v. District of Columbia*, 970 F. Supp. 2d 23, 34 (D.D.C. 2013). The court also ruled that Dukore and Canavan had stated a claim for conversion, but at their request, dismissed that count of the complaint "without prejudice to re-file in [D.C.] Superior Court." *Id.* at 34 n.9 (internal quotation marks omitted). The court designated its order dismissing the action as "a final, appealable order." J.A. 41.

Dukore and Canavan timely appealed. The conversion claim is not at issue on appeal because the district court dismissed it at Dukore's and Canavan's request. Dukore and Canavan have also chosen not to press their Fifth Amendment due process claim on appeal, so the district court's dismissal of that claim is conclusive.

## II

## Analysis

### *Jurisdiction*

The first order of business is always to decide whether we can decide the appeal. The district court had federal question jurisdiction over the constitutional claims, 28 U.S.C. § 1331 and 42 U.S.C. § 1988, and supplemental jurisdiction over the related District law claims, 28 U.S.C. § 1367. This court has appellate jurisdiction under 28 U.S.C. § 1291 over "final decisions" of the district court.

Confirming our jurisdiction is usually an easy task in cases where plaintiffs with obvious standing raise federal

questions on appeal from a federal district court's final judgment. There is a wrinkle in this case though: the district court's final judgment included the dismissal of one claim—the conversion claim—*without* prejudice, at Dukore's and Canavan's request. The federal courts of appeals have issued conflicting decisions on whether and when a voluntary dismissal without prejudice constitutes a final judgment for purposes of appeal. *See, e.g.*, *Robinson-Reeder v. American Council on Education*, 571 F.3d 1333, 1338–1339 (D.C. Cir. 2009); *see also Blue v. District of Columbia Public Schools*, 764 F.3d 11, 17 (D.C. Cir. 2014) (collecting cases).

A decision "is not final, ordinarily, unless it ends the litigation on the merits and leaves nothing for the [district] court to do but execute the judgment." *Cunningham v. Hamilton County*, 527 U.S. 198, 204 (1999) (internal quotation marks omitted). Accordingly, when a district court resolves some, but not all, of the claims in a complaint, the judgment is generally non-final and non-appealable. *See, e.g.*, *Cambridge Holdings Group, Inc. v. Federal Ins. Co.*, 489 F.3d 1356, 1359–1360 (D.C. Cir. 2007). The only way to take an appeal from such a partial disposition is if the district court both chooses to "direct entry of a final judgment as to one or more, but fewer than all, claims or parties," and "expressly determines that there is no just reason for delay." Fed. R. Civ. P. 54(b).[1]

---

[1] A small class of orders may qualify for interlocutory appeal. *See, e.g.*, *Mohawk Industries, Inc. v. Carpenter*, 558 U.S. 100, 106 (2009) (describing collateral order doctrine); *see also In re District of Columbia*, --- F.3d ---, 2015 WL 3916061, at *2 (D.C. Cir. June 26, 2015) (interlocutory appeal of class certification under Fed. R. Civ. P. 23(f)); 28 U.S.C. § 1292 (jurisdiction to review certain interlocutory orders). This case does not involve any such order.

Parties cannot stipulate their way out of the final judgment rule or Rule 54(b)'s strict limitations. The "voluntary but non-prejudicial dismissal[] of remaining claims" is "insufficient to render final and appealable a prior order disposing of only part of the case." *Blue*, 764 F.3d at 17; *see also Robinson-Reeder*, 571 F.3d at 1338–1340.

The question in this case is whether the district court's dismissal of the conversion claim without prejudice as part of a single order dismissing the entire action ran afoul of that jurisdictional rule. We hold that it did not, because the district court, not the parties, controlled the terms of dismissal in this case, and the final judgment dismissing the action in full in a single, dispositive order protects against manipulation of the courts' jurisdiction.

In *Blue*, the district court dismissed the plaintiff's claims against one defendant but not another. 764 F.3d at 14. As a result, the case against the remaining defendant remained active and unresolved, and the district court declined to certify its partial judgment for appeal under Rule 54(b). The plaintiff then tried to bypass the district court's declination by entering a joint stipulation of dismissal without prejudice with the remaining defendant, "subject to a confidential settlement agreement with a tolling provision" that would have permitted a refiling of the claim after the appeal. *Id.* at 16; *see also id.* at 14–15.

We held that such a party-initiated voluntary dismissal, especially in the wake of the district court's decision denying certification under Rule 54(b), was insufficient to render the court's judgment final for purposes of appellate jurisdiction. *Blue*, 764 F.3d at 19. Otherwise parties would be free to entirely supplant the district court's screening function—the court's role as "dispatcher"—under Rule 54(b), and could

make final a case with which neither the district court nor the parties are genuinely done. *Id*. at 18. The entry of a minute order by the district court did not suffice because it was a mere "ministerial acknowledgement of the parties' joint stipulation," which the district court was obliged to grant unless it found prejudice to the defendant. *Id.* at 19.

Similarly, in *Robinson-Reeder*, the district court dismissed some claims in the complaint, but left one claim unresolved. 571 F.3d at 1335–1336. Before the district court ruled on the defendant's motion to dismiss the remaining claim, the parties filed a joint stipulation dismissing the final claim without prejudice. *Id.* at 1336. We held that such a voluntary stipulation by the parties does not satisfy Rule 54(b)'s requirement of an express determination by the district court that a partial dismissal should be treated as final. That is because dismissal was "accomplished by stipulation of the parties alone pursuant to Federal Rule of Civil Procedure 41(a)(1)." *Robinson-Reeder*, 571 F.3d at 1339. We accordingly dismissed the appeal for lack of jurisdiction. *Id.* at 1339–1340.

This case bears no relevant similarity to *Blue* or *Robinson-Reeder*. Here, the district court entered a single, final judgment, designated as such by the court itself, in which "all pending claims against all parties were resolved." *Outlaw v. Airtech Air Conditioning & Heating, Inc.*, 412 F.3d 156, 162 (D.C. Cir. 2005) (Roberts, J.). Absent appellate reversal, the federal action is concluded with nothing left to be done.

While the voluntary dismissal without prejudice may allow Dukore and Canavan to refile their local law claim in District of Columbia Superior Court, the action's dismissal from federal court is conclusive because there is no basis for federal jurisdiction to refile that claim by itself. *See Murray*

*v. Gilmore*, 406 F.3d 708, 712 (D.C. Cir. 2005) (appealable dismissal of an action signified by district court designating its order as "final and appealable"); *Ciralsky v. CIA*, 355 F.3d 661, 667 (D.C. Cir. 2004) ("Although it is true that [the plaintiff] *may* be able to re-file because the dismissal was without prejudice, that does not change the fact that, in the absence of such an affirmative act on [plaintiff's] part, the case is at an end."). The district court accordingly fulfilled its function as "gatekeeper for the court of appeals," *Blue*, 764 F.3d at 18, and the court alone determined when the case was over and its order became final. The district court's control of the disposition and issuance of a single final judgment eliminated the "risk [of] empowering parties to take over" the district court's "dispatcher function" that can arise from partial dispositions. *Id.*[2]

With our jurisdiction assured, we press on to the merits.

### *Probable Cause to Arrest*

Disposition of Dukore's and Canavan's Fourth Amendment and false arrest claims hinges largely on the

---

[2] To be sure, the district court's labeling its order as "final and appealable," standing alone, ordinarily would not render that order appealable under Rule 54(b). *See Blackman v. District of Columbia*, 456 F.3d 167, 176 (D.C. Cir. 2006) ("[E]ven if the record indicates no just reason for delay, an order is not final under Rule 54(b) unless it contains the 'express determination' thereof."). But this is not a Rule 54(b) case; the court itself entered final judgment, and the absence of party manipulation, along with Dukore's and Canavan's inability to reinitiate federal court litigation of the voluntarily dismissed conversion claim, dispose of the finality concerns that underlay *Blue* and *Robinson-Reeder*.

existence or not of probable cause to justify Dukore's and Canavan's arrests.  Because probable cause was present, we affirm the dismissal of both claims.

Probable cause exists "when known facts and circumstances are sufficient to warrant [an officer] of reasonable prudence in the belief that an offense has been or is being committed."  *United States v. Davis*, 458 F.2d 819, 821 (D.C. Cir. 1972).  The probable cause standard does "not demand any showing that such a belief be correct or more likely true than false."  *Texas v. Brown*, 460 U.S. 730, 742 (1983).  The existence of probable cause thus turns on objective considerations, rather than the actual mental state of the arresting officer.  *See, e.g.*, *United States v. Jackson*, 415 F.3d 88, 91 (D.C. Cir. 2005).

We hold that the arresting officers had probable cause to conclude that Dukore and Canavan had violated the temporary-abode regulation.  There is no dispute that Dukore and Canavan "set up" a "tent" on public property, within the meaning of the District regulation, D.C. Code. Mun. Regs. Title 24, § 121.1.  *See* Complaint ¶ 26.  So the probable-cause question boils down to whether it was reasonably prudent for the arresting officers to conclude that, in doing so, Dukore and Canavan set up a "temporary place of abode."  We have no doubt that the officers' judgment was reasonable under the circumstances.  The plain meaning of "temporary" is short-term in duration.  To be sure, the time must still be long enough for the stay to count as an "abode" rather than a place of passing respite.  If the officers reasonably perceived that Dukore and Canavan intended to stay through the night hours, that would suffice. *Cf. United States v. Lyons*, 706 F.2d 321, 327 (D.C. Cir. 1983) (reasonable expectation of privacy for Fourth Amendment purposes in hotel room occupied for a single night).

A reasonable officer could have concluded, on these facts, that Dukore and Canavan intended to occupy the tent through the night hours. To begin with, Dukore and Canavan set up a tent in which they then took shelter. A central purpose for such a tent is to serve as a temporary place of shelter and abode. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2356 (1993) (defining a "tent" as a "collapsible shelter * * * used for camping outdoors (as by soldiers or vacationers)"). And this was not just any tent. As the complaint avers, the tents at the protest were "clearly identified" with the Occupy D.C. movement, the purpose of which was use of the tent for the "physical occupation" of protest sites. Complaint ¶¶ 14–20. An occupation, by its very nature, requires some length of time—longer than just passing through. Or so a reasonable officer could conclude.

In addition, Dukore and Canavan did not merely assemble a tent on public property late at night. They *re*assembled their tent and stayed in it after officers had twice ordered them to take the tents down and had thrice warned that they could not lawfully remain inside the reassembled tent. Complaint ¶ 26. A reasonable officer could interpret that defiance as exhibiting an intent to stay put inside their tent for some time. Doubly so given the late night hour when this all transpired. The only likely options for Dukore and Canavan at nearly 11:00 p.m. would have been to go home or stay for a good part of the night. Reassembling and then occupying the tent in the face of contrary orders by police strongly suggested the latter possibility.

Dukore and Canavan assail this conclusion on three grounds, but none works. *First*, they focus on the requirement that the tent be a place of "abode" and emphasize that the tent contained no bedding, heat, or other living equipment to get them through a cold February night. Those

are fair points. But not enough to change the outcome. The essence of probable cause is making close judgment calls based on oftentimes conflicting information. *See, e.g.*, *Galarnyk v. Fraser*, 687 F.3d 1070, 1075 (8th Cir. 2012) ("[A]n officer faced with conflicting information * * * may still have probable cause and need not conduct a mini-trial before effectuating an arrest.") (internal citations and quotation marks omitted). Given that the Occupy Movement's animating purpose is to oppose economic injustice and poverty, and that the plaintiffs displayed that message openly on signs attached to their tent, *see* Complaint ¶ 28, a reasonable officer could conclude that enduring a deliberately spartan abode at the feet of Merrill Lynch was itself part of the protestors' message. Surely a Winnebago would have sent the wrong signal.

*Second*, Dukore and Canavan emphasize that they had occupied the tent only for "a matter of minutes or hours, not days." Dukore Br. 16. "Days" are not needed for a tent to be a "temporary" abode; "hours" can be enough. Beyond that, the argument forgets that what cut Dukore's and Canavan's protest short was the intervention of the police. The police did not need to wait all night for the offense to be completed to reasonably conclude that Dukore and Canavan had "set up" a temporary place of abode, D.C. Code. Mun. Regs. Title 24, § 121.1.

*Third*, Dukore and Canavan argue that, notwithstanding the temporary-abode regulation, the District's Assemblies Act protects their right to use a "structure," specifically a tent, as part of a protest. D.C. Code § 5-331.05(g). That argument overlooks that the Assemblies Act expressly allows for "reasonable time, place, and manner restrictions" on expressive activity. D.C. Code § 5-331.04(b). The prohibition on that structure turning into a temporary abode is

precisely such a reasonable time and manner restriction on protest activities. *Cf. Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 294 (1984) ("[S]ymbolic tents * * * may be expressive and part of the message delivered by [a] demonstration [but that] does not make the ban [on sleeping on the National Mall] any less a limitation on the manner of demonstrating, for reasonable time, place, or manner regulations normally have the purpose and direct effect of limiting expression but are nevertheless valid.").

In sum, because the arresting officers had probable cause to believe that Dukore's and Canavan's late-night reassembly and persisting occupation of their tent constituted the setting up of a temporary place of abode, in violation of D.C. law, the arrest did not violate the Fourth Amendment or constitute a false arrest. *See Scales*, 973 A.2d at 729.

### *Retaliatory Arrest*

Dukore and Canavan also argue that the officers arrested them in retaliation for their protest, in violation of their First Amendment rights. Qualified immunity bars that claim, however, because at the time of their arrest it was not clearly established that an arrest supported by probable cause could violate the First Amendment's protection against retaliation.[3]

The doctrine of qualified immunity entitles officers to immunity from suit unless their conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457

---

[3] Dukore and Canavan do not argue that the temporary-abode regulation is so facially unconstitutional that a reasonable officer would know that an arrest for violating the regulation, even if supported by probable cause, would violate the First Amendment.

U.S. 800, 818 (1982)). Qualified immunity considers the state of the law not with 20-20 hindsight, but at the time of the challenged conduct. *See, e.g.*, *Kalka v. Hawk*, 215 F.3d 90, 94 (D.C. Cir. 2000). And a right will be held to have been clearly established at the time of an alleged violation if it would have been "clear to a reasonable officer that his conduct was unlawful in the situation that he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). If the right in question was not clearly established, we need not broach the question of whether a constitutional violation occurred because the officers are entitled to qualified immunity regardless. *See Pearson*, 555 U.S. at 236.

In reviewing a grant of qualified immunity, we must consider the right asserted "not as a broad general proposition, but in a particularized sense so that the contours of the right are clear[.]" *Reichle v. Howards*, 132 S. Ct. 2088, 2094 (2012) (internal citations and quotation marks omitted). So the right we must consider in this case is "not the general right to be free from retaliation for one's speech," but rather "the more specific right to be free from a retaliatory arrest that is otherwise supported by probable cause." *Id.*

The Supreme Court has "never held that there is such a right." *Reichle*, 132 S. Ct. at 2094. Nor was there in February 2012 (nor is there now) any settled consensus view in this court or other federal courts of appeals such that "the statutory or constitutional question" has been placed "beyond debate." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011); *see also Bame v. Dillard*, 637 F.3d 380, 384 (D.C. Cir. 2011) (to determine clearly established law, "we look to cases from the Supreme Court and this court, as well as to cases from other courts exhibiting a consensus view—if there is one") (internal citations and quotation marks omitted). Quite the opposite, in July 2011, this court recognized that the federal

courts of appeals were split on whether a plaintiff claiming retaliatory arrest had to show that the arrest lacked probable cause, and expressly declined to take sides. *See Moore*, 644 F.3d at 423 n.8. That means that, at the time of the arrests in this case, precedent in this and other circuits was either inconclusive or actively in conflict on whether the existence of probable cause precluded an arrest from being deemed "retaliatory." That is a far cry from placing the question beyond debate.

Dukore and Canavan argue that the right to be free from retaliation under the First Amendment is clearly established. And they argue that the only confusion in the law concerned retaliatory *prosecutions*, as discussed in *Hartman v. Moore*, 547 U.S. 250 (2006). Dukore and Canavan further contend that any ripples of uncertainty generated by *Hartman* in other jurisdictions did not unsettle this circuit's law, because we have recognized that "retaliatory arrest and retaliatory prosecution are distinct constitutional violations[.]" *Moore v. Hartman*, 704 F.3d 1003, 1004 (D.C. Cir. 2013). The absence of confusion in this jurisdiction, they conclude, left as governing law for the officers the clearly established background right to be free from retaliation under the First Amendment.

That argument turns the qualified immunity burden upside down. It is Dukore's and Canavan's burden to show that the particular right in question—narrowly described to fit the factual pattern confronting the officers, *see Reichle*, 132 S. Ct. at 2094—was clearly established. It was not the District's burden to show that the right had been called into question. The generality of Dukore's and Canavan's constitutional principle and the widespread instability in the law on the precise question of probable-cause arrests prevent them from discharging that duty.

## III

## Conclusion

The district court's decision to dismiss one count of the complaint without prejudice, as part of its final order dismissing the action in its entirety, did not deprive this court of appellate jurisdiction. On the merits, we affirm the judgment of dismissal.

*So ordered.*