# United States Court of Appeals

## For the Eighth Circuit

_____

No. 16-1807

_____

Ramon Mendoza

*Plaintiff - Appellant*

Laura Mendoza

*Plaintiff*

v.

United States Immigration and Customs Enforcement; John Does, #1-5

*Defendant*s

Jeff Davis, Sarpy County, Nebraska Sheriff

*Defendant - Appellee*

John Does, #6-10

*Defendant*s *- Appellees*

Justin Osterberg, individually; Sarpy County, Nebraska

*Defendants - Appellees*

_____

Appeal from United States District Court
for the District of Nebraska - Omaha

_____

Submitted: November 17, 2016
Filed: February 21, 2017

_____

Before COLLOTON, BEAM, and GRUENDER, Circuit Judges.

_____

BEAM, Circuit Judge.

Ramon Mendoza appeals the district court's[1] grant of summary judgment in favor of Defendants Justin Osterberg; Sarpy County, Nebraska (the County); John Does 6-10[2] (the County employees); and Sheriff Davis on numerous claims based on an improper immigration detainer issued on March 5, 2010, and withdrawn on March 8, 2010. For the reasons discussed below, we affirm.

## I.    BACKGROUND

Mendoza is a naturalized United States citizen with the full birth name Ramon Mendoza Gallegos. He typically uses the name Ramon Mendoza. Mendoza has a

_____

[1]The Honorable Joseph F. Bataillon, United States District Judge for the District of Nebraska.

[2]Based on the district court's analysis of "the County employees" and the arguments made before this court regarding "Sarpy County personnel" and "Sarpy County jail staff," we presume that John Does 6-10 are employees of the Sarpy County jail and construe the district court's order as holding that John Does 6-10 were entitled to qualified immunity. Mirroring the district court's order, we refer to John Does 6-10 as "the County employees."

valid United States passport and a Social Security card and number issued by the Social Security Administration. Mendoza has never been charged with or convicted of a state or federal felony but has several convictions for driving-related offenses. At the time of the incident relevant to this case, there were no outstanding warrants for his arrest.

At approximately 4:00 p.m. on Friday, March 5, 2010, while driving his niece's vehicle, Mendoza was pulled over by police officers for having an obstructed view. Mendoza did not have a driver's license or the vehicle's registration. He was arrested for driving with a revoked license. The officers told him that he would be taken to the Sarpy County Jail to be processed and then released. Mendoza was booked on the state charges of driving under revocation of a license, no proof of insurance, and obstructed view. Sarpy County Deputy Lyle was at the intake desk and began the intake process. Lyle asked Mendoza questions and wrote Mendoza's responses on a preprinted intake form. They communicated in English. Mendoza gave his name, address, and other information, but he misstated the last digit of his social security number. When asked for his city of birth, he stated that he did not know. Because Lyle's shift ended, he did not complete Mendoza's intake form. Deputy Titus continued the intake procedure with Mendoza. Titus and Mendoza communicated in English. In his deposition, Titus stated that he did not specifically recall this encounter with Mendoza, but he recognized his handwriting on the intake form. The final intake form stated that Mendoza was not a United States citizen and that his language was Spanish. At no time during the intake procedure did Mendoza disclose his United States citizenship status. Mendoza claims none of the officers asked about his citizenship. Mendoza signed the completed intake form. He also signed a 48-hour waiver form, waiving his right to appear before a judge expeditiously.

In the normal course, after the intake paperwork is completed, deputies pass the paperwork to booking clerks who input the data into the jail's computerized booking software, follow up with other agencies as necessary, and assign each arrestee to

temporary housing. The booking clerks on duty on March 5, 2010, were Mary Sortino and Brandi Chase, neither of whom have a specific recollection of Mendoza's paperwork. As part of the Sarpy County Jail's policy, the booking staff is supposed to update the inmate's records from prior periods of incarceration. This was the fourth time Mendoza had been booked at the Sarpy County Jail. The three prior records showed the same name, address, date of birth, and place of birth. However, in October 2006, Mendoza gave a social security number that differed in four digits from his actual number. Also relevant, the prior records showed that he was a United States citizen and that his language was English. A record from 2008 showed that Immigration and Customs Enforcement (ICE) confirmed that Mendoza was a United States citizen. This note from 2008, however, was entered in the "notes" portion of the "booking information" screen, a screen that was not normally accessed during the booking procedure and not available to all jail employees.

Prior to March 2010, ICE sent a memorandum to the Sarpy County Jail requesting that booking clerks call ICE on its toll-free phone number whenever the jail received an inmate with a foreign birth place or any other reason that made the clerk uncertain of the arrestee's citizenship status. Because Mendoza's intake form noted that Mendoza was born in Mexico and that he was not a United States citizen, Sortino called ICE's toll-free number at 6:08 p.m. on March 5, 2010. In November 2009, Nebraska and Iowa ICE officers started a duty rotation to cover calls from law enforcement agencies that came in after hours, on weekends, or on holidays. An ICE agent was assigned the duty phone on a rotating basis and would handle all phone inquiries from law enforcement about particular individuals. The ICE agent determined whether to place an immigration detainer on any individual in custody. An immigration detainer is a notice to law enforcement that ICE seeks custody of an alien not legally in the United States. The detainer tells law enforcement that ICE intends to assume custody of the alien, requests information from law enforcement about the alien's impending release, and requests that law enforcement maintain custody of an alien who would otherwise be released for up to 48 hours, not including

weekends or holidays. When determining whether to issue a detainer, ICE agents weigh evidence received from law enforcement and the individual, paying special attention to the person's social security number, place of birth, date of birth, and other identifying information. The ICE agent is also able to contact the Law Enforcement Service Center (LESC) to run database checks if the agent does not have access to the necessary databases.

Osterberg, the ICE agent on duty on March 5, was working from his home in Cedar Rapids, Iowa, when he answered Sortino's call. This was the first time he had ever spoken to anyone from the Sarpy County Jail. This was also his first time handling a weekend duty assignment. Osterberg did not have direct access to any databases because the duty laptop was broken. Sortino's normal practice was to give the ICE agent the information from the intake form, including the inmate's name, date of birth, and whether the inmate denied United States citizenship. If asked, she would also provide the inmate's social security number, place of birth, and local charges. Sortino provided the name from the intake sheet, Ramon Mendoza. Osterberg testified that he was not told that Mendoza was claiming United States citizenship. Osterberg spoke with Mendoza, who provided his name (Ramon Mendoza), date of birth, parents' names, and social security number, and stated that he was born in Mexico. Mendoza never mentioned that he was a United States citizen.

Osterberg then contacted LESC, provided Mendoza's information, and asked LESC to search their databases. LESC found two files that matched Mendoza's information. Both files had information about Ramon Mendoza with the same date of birth, social security number, and father's name. However, the two files had different names listed for the mother, different Alien File (A-File) numbers, and different second last names. The first file was for Ramon Mendoza-Gutierrez, an aggravated felon who was previously removed from the United States to Mexico on March 21, 2008. The second file was for Ramon Mendoza-Gallegos, a legal permanent resident. Because Osterberg was working from home on a weekend, he

had no way to access the A-Files. It is very common, however, for one individual to have more than one A-File from various situations, such as if the person enters the United States illegally or where a person uses different aliases. Also, identity theft is very common among illegal aliens. Based on the matching social security number, date of birth, and father's name, Osterberg determined that the two files from LESC were "one and the same person." Thus, Osterberg concluded that he had probable cause to believe that the Sarpy County Jail had Ramon Mendoza-Gutierrez, an aggravated felon subject to removal.

At approximately 6:19 p.m. on March 5, 2010, while Osterberg was collecting information and contacting LESC, Sortino conducted an initial National Crime Information Center (NCIC) database search and printed a report on Mendoza. Like the information from LESC, the NCIC report contained several possible individuals with the same or similar names and identical dates of birth. The report contained the following names: Ramon Mendoza, Ramon Mendoza-Gallegos, and Ramon Mendoza-Gutierrez. Because Mendoza misstated the last number of his social security number on the intake form, none of the social security numbers in the NCIC database exactly matched the social security number Mendoza reported on March 5. Mendoza-Gallegos had the same FBI number, state identification number, and birth date as the information for the person listed as Ramon Mendoza. The listing for Mendoza-Gallegos also had a social security number matching the person listed as Ramon Mendoza and a social security number only one digit off from the social security number listed on Mendoza's intake form. The Mendoza-Gallegos listing further showed a birthplace of Mexico and no information on citizenship. The listing for Mendoza-Gutierrez similarly contained the same birth date as Mendoza, as well as a social security number only one digit off from the social security number listed on Mendoza's intake form. "Ramon Mendoza" was also listed as an alias on the Mendoza-Gutierrez report.

On March 5, 2010, Osterberg requested that LESC issue a detainer for Ramon Mendoza-Gutierrez. LESC faxed the detainer to the Sarpy County Jail. At approximately 8:00 p.m., jail staff entered data from the ICE detainer and the NCIC report into the booking system, including Ramon Mendoza-Gutierrez as an alias and the FBI number associated with Mendoza-Gutierrez. Mendoza was then fingerprinted. The fingerprint form contained the name "Ramon Mendoza-Gutierrez," but Mendoza signed the form as "Ramon Mendoza." Osterberg did not obtain Mendoza's fingerprints because he had no way to receive them at his home. Later that evening, Sortino notified ICE that Mendoza was ready to be picked up. Osterberg had no further communication with the jail staff concerning Mendoza that weekend.

After learning of the ICE detainer, Mendoza told Sarpy County Jail staff that he was a United States citizen, but he never asked to speak to an ICE agent. Mendoza's son, Richard, had followed the officers to the Sarpy County Jail after Mendoza was arrested. After Richard told the person over the intercom that his father was a United States citizen, he was told that his father was being detained because of a hold on immigration. Richard then called his mother, Mendoza's wife. Mendoza's wife claims she came to the jail's 24-hour entrance at least three times that weekend with Mendoza's naturalization certificate, United States passport, and marriage license as proof of his citizenship. She claims that she spoke to someone over the intercom and showed papers to the camera in an effort to get Mendoza released. She also testified that on Sunday she was finally allowed into a secure second room where she spoke to a man who told her that they had "the guy [they] were looking for and he committed several crimes." Mendoza's wife claims that the man never took or commented on the documents she tried to show him. Sarpy County Jail officials testified that it is very rare for a person to come to the jail with papers claiming citizenship, but if someone had, the staff would have told the person to take the documents to ICE. The booking clerks agreed that this would have been the procedure followed in this situation. Mendoza's wife and son never contacted ICE.

Thus, Osterberg never knew that anyone at the Sarpy County Jail was claiming or had evidence that Mendoza was a United States citizen.

On Monday, March 8, 2010, Osterberg went to his office and reviewed the detainer sent on Friday evening for Ramon Mendoza-Gutierrez. Osterberg called the Sarpy County Jail and requested a copy of Mendoza's fingerprints. When he received Mendoza's fingerprints and ran them through the IDENT system in the Cedar Rapids office, the database showed that Mendoza's fingerprints did not match the prints of Ramon Mendoza-Gutierrez, the aggravated felon, but instead matched the second individual in the file, Ramon Mendoza-Gallegos. This was the first time Osterberg was able to confirm that the two files were, in fact, for two separate individuals. Osterberg immediately canceled the detainer that was issued on March 5, 2010, by faxing a document to the Sarpy County Jail. It was cancelled well before the 48-hour hold deadline. The booking clerk who received the fax from Osterberg processed Mendoza for release. Mendoza was taken to the hospital and treated for nausea and diarrhea.

Alleging numerous violations of his constitutional rights, including a substantive due process claim, Mendoza filed a Bivens[3] claim against Osterberg and John Does 1-5[4] and a § 1983 claim against Davis, John Does 6-10, and the County. Mendoza further alleged that Osterberg, Davis, the John Does, and the County (collectively "Defendants") engaged in a civil conspiracy in violation of 42 U.S.C.

---

[3]Under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 397 (1971), an individual may sue federal officials for constitutional violations. "An action under Bivens is almost identical to an action under section 1983, except that the former is maintained against federal officials while the latter is against state officials." Christian v. Crawford, 907 F.2d 808, 810 (8th Cir. 1990).

[4]In his brief to the district court, Mendoza stated that his claims against John Does 1-5 would be dismissed. The district court construed the language as a motion to dismiss and granted the motion.

§ 1985(3). This claim was based on the Sarpy County Jail's participation in the State Criminal Alien Assistance Program (SCAAP), which provides partial reimbursement funds to offset the cost of holding immigration prisoners for the federal government. Defendants moved for summary judgment. The district court held that "the facts [did] not establish the violation of a constitutional right." Because the district court found no violation of a constitutional right, Mendoza's claim for supervisory and municipal liability failed. Nonetheless, the district court found no evidence of "constitutionally deficient" policies or training. The district court also held that "Mendoza's substantive due process claim fail[ed] because it [was] 'covered' under the Fourth Amendment," and even if it was not, there was no "conscience-shocking behavior that meets the threshold for imposition of liability under the substantive prong of the Fourteenth Amendment." As for the civil rights conspiracy claim, the district court found "no evidence, circumstantial or otherwise, from which the court [could] infer a conspiracy or any discriminatory animus."

Mendoza now appeals arguing that the district court erred by (1) granting summary judgment in favor of Defendants; (2) holding that none of Mendoza's clearly established rights were violated by Defendants; (3) granting qualified immunity to Defendants; (4) finding there was arguable probable cause for the ICE detainer; (5) holding that Davis and the County had no supervisory liability or liability for inadequate or unconstitutional jail policies and training; and (6) holding there was no evidence of Defendants' conspiracy in violation of 42 U.S.C. § 1985(3).

## II.    DISCUSSION

### A.    Standard of Review

We review the district court's grant of summary judgment de novo, viewing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in favor of the nonmoving party. Bishop v. Glazier, 723 F.3d

-9-

957, 960-61 (8th Cir. 2013). A party is entitled to summary judgment only if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "When a defendant asserts qualified immunity at the summary judgment stage, the plaintiff must produce evidence sufficient to create a genuine issue of fact regarding whether the defendant violated a clearly established right." Bishop, 723 F.3d at 961.

Under the doctrine of qualified immunity, government officials are generally immune from civil liability so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). It gives "government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." Blazek v. City of Iowa City, 761 F.3d 920, 922 (8th Cir. 2014) (quoting Stanton v. Sims, 134 S. Ct. 3, 5 (2013)). To determine whether a government official is entitled to qualified immunity, we must ask (1) whether the official's action violated a constitutional right; and (2) whether the violated right was clearly established. Borgman v. Kedley, 646 F.3d 518, 522 (8th Cir. 2011). "The defendants are entitled to qualified immunity unless the answer to both of these questions is yes." McCaster v. Clausen, 684 F.3d 740, 746 (8th Cir. 2012). A right is clearly established when "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). In other words, the right violated must have been established "beyond debate." Hollingsworth v. City of St. Ann, 800 F.3d 985, 989 (8th Cir. 2015) (quoting City & Cty. of S.F., Cal. v. Sheehan, 135 S. Ct. 1765, 1774 (2015)).

B.     **Bivens** Claim

Mendoza argues that the district court erred in holding that Osterberg had arguable probable cause to issue the ICE detainer. Mendoza argues that Osterberg

did not have arguable probable cause because Osterberg (1) failed to ask Mendoza about his citizenship, (2) ignored conflicting information, and (3) failed to conduct a sufficient investigation.

A warrantless seizure or detention by a law enforcement officer must be supported by probable cause. Borgman, 646 F.3d at 522. However, "an officer is entitled to qualified immunity if there is at least 'arguable probable cause.'" Id. at 522-23 (quoting Walker v. City of Pine Bluff, 414 F.3d 989, 992 (8th Cir. 2005)). "Arguable probable cause exists even where an officer mistakenly arrests a suspect believing it is based in probable cause if the mistake is 'objectively reasonable.'" Id. at 523 (quoting Amrine v. Brooks, 522 F.3d 823, 832 (8th Cir. 2008)). "[I]t is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and . . . in such cases those officials . . . should not be held personally liable." Anderson, 483 U.S. at 641.

First, it was reasonable for Osterberg not to question Mendoza further about his citizenship. Mendoza told Osterberg that he was born in Mexico, Mendoza never mentioned that he was a United States citizen, and "an individual born abroad is presumed to be an alien and bears the burden of rebutting that presumption." Nadal-Ginard v. Holder, 558 F.3d 61, 68 (1st Cir. 2009). Moreover, "there is no rule of law which prohibits officers charged with the administration of the immigration law from drawing an inference from the silence of one who is called upon to speak." United States ex rel. Bilokumsky v. Tod, 263 U.S. 149, 154 (1923). Because Mendoza failed to disclose his citizenship to Osterberg or Sarpy County Jail officials, Osterberg was entitled to conclude from Mendoza's silence that he was not a United States citizen. Moreover, Mendoza signed the intake form, which stated that he was not a United States citizen.

Second, Osterberg did not ignore information but rather reasonably interpreted it. LESC provided two files that could have been related to Mendoza. The file for

-11-

Mendoza-Gutierrez said he was an aggravated felon with no legal status in the United States. The file for Mendoza-Gallegos listed the man as a lawful permanent resident. Because of the similar names and matching social security numbers and birth dates, Osterberg decided that the files were referring to the same person. Based on his experience, Osterberg knew that identity theft is common among people living illegally in the United States, and it is not uncommon for ICE databases to contain more than one A-File relating to one person. The record shows no evidence that Osterberg ignored pertinent information. Rather, the record supports the reasonableness of Osterberg's belief that he was dealing with one individual with two files.

Third, Osterberg conducted a sufficient investigation using the resources he had at his disposal. It is true that had Osterberg been able to compare Mendoza's fingerprints to Mendoza-Gutierrez's fingerprints on March 5, the detention would have lasted a couple of hours instead of three days. However, because it was after hours on a Friday night, Osterberg had no means of obtaining and running the fingerprints. Thus, he was forced to rely on information provided by Sarpy County Jail officials and Mendoza. Such reliance is permitted so long as the reliance was reasonable, which it was here. See Doran v. Eckold, 409 F.3d 958, 965 (8th Cir. 2005). Osterberg then followed the common practice of ICE agents in this type of situation and contacted LESC to run a check of the information provided. The search returned two possible matches. "When an officer is faced with conflicting information that cannot be immediately resolved, . . . he may have arguable probable cause to arrest a suspect." Borgman, 646 F.3d at 523. Moreover, Osterberg had previously used LESC to retrieve information about individuals, and LESC generally provided correct information. Therefore, Osterberg had arguable probable cause to issue the ICE detainer and was entitled to qualified immunity.

-12-

## C.   42 U.S.C. § 1983 Claims

Section 1983 provides a cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by any person "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory." 42 U.S.C. § 1983. In Monell v. Department of Social Services of the City of New York, 436 U.S. 658, 690-91 (1978), the Supreme Court held that local governments could also be "sued [under § 1983] for constitutional deprivations visited pursuant to governmental 'custom'" or official policies.

### 1.   Qualified Immunity

Mendoza argues that Sheriff Davis and the County employees did not have arguable probable cause for the detainer and thus are not entitled to qualified immunity. Specifically, Mendoza argues that Davis and the County employees violated his constitutional rights by failing to ask him about his citizenship status; overlooking information in the NCIC report that would have differentiated him from Mendoza-Gutierrez; failing to conduct a basic, minimal investigation; refusing to look at evidence from his wife and son; and failing to check his prior records, which proved he was a citizen.

First, Davis was unaware that Mendoza had even been detained. As such, Davis could not have participated in any unconstitutional acts regarding Mendoza's detention. "Government officials are personally liable only for their own misconduct." S.M. v. Krigbaum, 808 F.3d 335, 340 (8th Cir. 2015). Because he had no "direct participation" in the alleged violations, he is entitled to qualified immunity. Id.

Second, evidence placed Mendoza's identity in question such that the County employees reasonably believed Mendoza was Mendoza-Gutierrez, the aggravated

felon for which the ICE detainer was issued. The County employees are entitled to qualified immunity so long as "there is any reasonable basis to conclude that probable cause existed." Walden v. Carmack, 156 F.3d 861, 870 (8th Cir. 1998). First, the initial NCIC report obtained by Sortino showed that Mendoza shared a first name, father's surname, date of birth, and social security number with Mendoza-Gutierrez, a deportable felon. Like Osterberg, the County employees did not overlook differentiating information but rather interpreted the conflicting information. Such conflicting information that cannot be immediately resolved usually gives an officer arguable probable cause to arrest or detain a suspect. Borgman, 646 F.3d at 523. The County employees then received an ICE detainer from Osterberg. As discussed above, Osterberg had arguable probable cause to issue the ICE detainer based on his training, as well as information from Mendoza and LESC. The County employees were entitled to rely on Osterberg's probable cause determination. See Doran, 409 F.3d at 965 (stating that law enforcement may reasonably rely on information from other law enforcement).

Mendoza points out that the booking clerk should have found the note in his 2008 intake form, which showed that he was a United States citizen. He also argues that the County employees should have examined the evidence Mendoza's wife and son brought to the jail. However, "a court should ask whether the law enforcement officials acted reasonably under settled law in the circumstances then existing, not whether another reasonable, or more reasonable interpretation of the facts can be constructed." Walden, 156 F.3d at 870. Here, given the complexity of the jail's electronic booking system at the time and the fact that the screen where Mendoza's citizenship status was denoted was not usually accessed during the booking process, it was not unreasonable for the booking clerk to overlook it. And, by the time Mendoza's wife and son arrived at the jail with proof of his citizenship, ICE had already confirmed that Mendoza was Mendoza-Gutierrez and issued a detainer. Any proof of citizenship needed to be presented to ICE. "Simply laying blame or fault and pointing out what might have been done is insufficient [to prove a constitutional

-14-

violation]." Luckert v. Dodge Cty., 684 F.3d 808, 818 (8th Cir. 2012) (quoting Rellergert v. Cape Girardeau Cty., Mo., 924 F.2d 794, 797 (8th Cir. 1991)).

Based on the intake process, incorrect information provided by Mendoza, NCIC search results, the phone call to Osterberg, and the subsequent ICE investigation, the evidence shows that the County employees conducted an adequate investigation. Once the County employees handed over the investigation to ICE, per Sarpy County Jail procedure, and later received an ICE detainer, the County employees' part in the investigation was over. They were not required to conduct a parallel investigation. See Akins v. Epperly, 588 F.3d 1178, 1184 (8th Cir. 2009). Nor were they expected to "cross-examine [Osterberg] about the foundation for the [detainer]." United States v. Hensley, 469 U.S. 221, 231 (1985) (quoting United States v. Robinson, 536 F.2d 1298, 1299 (9th Cir. 1976)). "The question is not whether the jailers did all they could have, but whether they did all the Constitution requires." Luckert, 684 F.3d at 818 (quoting Rellergert, 924 F.2d at 797). Here, the County employees conducted an adequate investigation and reasonably relied on Osterberg's probable cause determination for the detainer. Thus, there was no violation of Mendoza's constitutional rights, and the County employees are or would be entitled to qualified immunity.

## 2. Supervisory and Municipal Liability

Mendoza further argues that Sheriff Davis, along with the County, should be held liable under a failure to train or failure to supervise theory. According to Mendoza, because Davis was a veteran law enforcement officer, he should have known that constitutional violations were likely to occur when employees were handling ICE detainers without any training. Similarly, Mendoza argues that the County was liable under § 1983 because multiple grievous actions, by multiple employees, combined and rose to the level of a constitutional violation. Based on the evidence in the record, however, it is patently incorrect to say that Sarpy County Jail

-15-

staff had no training, policies, or practices for handling ICE detainers. Instructions on ICE detainers were set forth in an instructive memorandum. Booking clerks received on-the-job training as to all aspects of their duties and responsibilities, which included contacting ICE about incoming arrestees. Booking clerks even testified that ICE's expectations guided their actions. ICE specifically asked that booking clerks call a toll-free number under certain circumstances and allow ICE to resolve any uncertainty as to an arrestee's citizenship.

Even if there were no policies or training on how to handle ICE detainers, there must first be an obvious need for the training before a failure to have it will be considered a constitutional violation. See City of Canton, Ohio v. Harris, 489 U.S. 378, 390 (1989).

> When a supervising official who had no direct participation in an alleged constitutional violation is sued for failure to train or supervise the offending actor, the supervisor is entitled to qualified immunity unless plaintiff proves that the supervisor (1) *received notice of a pattern* of unconstitutional acts committed by a subordinate, and (2) was deliberately indifferent to or authorized those acts.

Krigbaum, 808 F.3d at 340 (emphasis added). Similarly, "[o]nly where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality–a 'policy' as defined by our prior cases–can a city [or county] be liable for such a failure under § 1983." City of Canton, Ohio, 489 U.S. at 389. Here, the Sarpy County Jail honored ICE detainers for numerous years without any problems. Neither Davis nor the County could have been on notice that ICE detainers were an issue that required additional training. Thus, even absent any policy or training on ICE detainers, there was no constitutional violation.

Mendoza's real complaint is that the training and policies in place did not include certain steps relevant to Mendoza's particular situation that might have

prevented this mistake. However, "[i]n virtually every instance where a person has [allegedly] had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." Id. at 392. Here, there was general training on ICE detainers but not specific training for this particular situation. Lack of particularized training that might have prevented Mendoza's three-day detention does not establish a constitutional violation. Id.; Connick v. Thompson, 563 U.S. 51, 67 (2011). Each of the employees allegedly made independent mistakes in their various jobs. Their actions cannot reasonably be attributed to a defective governmental policy or custom. Additionally, the claims against Davis and the County automatically fail for lack of an underlying constitutional violation. See City of Los Angeles v. Heller, 475 U.S. 796, 798-99 (1986). Thus, the district court was correct in granting summary judgment in favor of Davis and the County on Mendoza's claims of supervisory and municipal liability under § 1983.

### D.    Fifth Amendment Due Process Claim

Mendoza argues that the district court ignored his Fifth Amendment substantive due process claim against Defendants when it held that the claim failed because it was covered by the Fourth Amendment claim. The claim arose out of the illegal detention, which the district court discussed extensively. "Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." Cty. of Sacramento v. Lewis, 523 U.S. 833, 842 (1998) (quoting Albright v. Oliver, 510 U.S. 266, 273 (1994) (plurality opinion of Rehnquist, C.J)). Thus, the district court was correct in dismissing the claim, as it was explicitly covered under the Fourth Amendment analysis.

Even so, as the district court correctly held, none of Defendants' acts or omissions meet the standard necessary for a substantive due process claim. "The Fourteenth Amendment guarantees '[s]ubstantive due process[, which] prevents the government from engaging in conduct that shocks the conscience or interferes with rights implicit in the concept of ordered liberty.'" Moran v. Clarke, 296 F.3d 638, 643 (8th Cir. 2002) (en banc) (alterations in original) (quoting Weiler v. Purkett, 137 F.3d 1047, 1051 (8th Cir. 1998) (en banc)). Mendoza was properly stopped and detained for violating traffic laws. Osterberg developed separate probable cause to believe Mendoza was a deportable felon, which provided a valid, legal basis for the ICE detainer. Finally, Defendants' failure to follow up or check on certain facts is only enough for an ordinary negligence claim, and "negligent conduct by government officials cannot be the source of a 'deprivation' of constitutional rights." Wells v. Walker, 852 F.2d 368, 371 (8th Cir. 1988). Nothing here shocks the conscience. "[T]he Due Process Clause is simply not implicated by a *negligent* act of an official . . . ." Daniels v. Williams, 474 U.S. 327, 328 (1986).

## E. Civil Conspiracy

Mendoza argues that the district court erred in holding that there was no evidence of Defendants' conspiracy in violation of 42 U.S.C. § 1985(3). To prove a conspiracy Mendoza must prove

> (1) that the defendants conspired, (2) with the intent to deprive [him] of equal protection of the laws, or equal privileges and immunities under the laws, (3) that one or more of the conspirators did, or caused to be done, any act in furtherance of the object of the conspiracy, and (4) that [he] was injured or deprived of having and exercising any right or privilege of a citizen of the United States.

Crutcher-Sanchez v. Cty. of Dakota, 687 F.3d 979, 987 (8th Cir. 2012). For the first element, Mendoza must "allege with particularity and specifically demonstrate with

material facts that the defendants reached an agreement." Davis v. Jefferson Hosp. Ass'n, 685 F.3d 675, 685 (8th Cir. 2012) (quoting City of Omaha Emps. Betterment Ass'n v. City of Omaha, 883 F.2d 650, 652 (8th Cir. 1989)). Mere speculation or conjecture is insufficient to prove a civil conspiracy. Mettler v. Whitledge, 165 F.3d 1197, 1206 (8th Cir. 1999).

At the outset, because there was no constitutional violation, this claim necessarily fails. See Askew v. Millerd, 191 F.3d 953, 957-59 (8th Cir. 1999) (holding that because there was no violation of a constitutional right or privilege, summary judgment in favor of the defendant on the § 1985 civil conspiracy claim was proper). However, even if we were to find a constitutional violation, there is no evidence that Defendants reached an agreement. Mendoza admits there is no direct evidence of a conspiracy between Defendants to deprive him of his constitutional rights but claims there is circumstantial evidence that points to a conspiracy. Specifically, Mendoza notes the Sarpy County Jail's longstanding cooperation with ICE on ICE detainers. This is not enough to show a conspiracy. Mere cooperation between entities is not "evidence of *specific facts* that show a 'meeting of the minds.'" Crutcher-Sanchez, 687 F.3d at 987 (emphasis added) (quoting Barstad v. Murray Cty., 420 F.3d 880, 887 (8th Cir. 2005)). Osterberg's office was located in Cedar Rapids, Iowa, approximately 270 miles from the Sarpy County Jail. Osterberg did not know any Sarpy County Jail employees and had never spoken to anyone associated with the jail prior to March 5, 2010. Osterberg had no direct access to Sarpy county records. Mendoza attempts to infer a conspiracy based on the SCAAP funds the Sarpy County Jail received. However, there is no evidence that any of the non-supervisory Sarpy County Jail employees were aware of the existence of the program. Even Davis was only minimally aware of the program. Plus, Defendants had nothing to gain by conspiring against Mendoza. The program does not provide reimbursement for wrongly holding a United States citizen. Because there is no evidence of a meeting of the minds between the conspirators, the district court correctly dismissed Mendoza's conspiracy claim.

## III.  CONCLUSION

The judgment of the district court is affirmed.

_____