UNITED STATES DISTRICT COURT 
 EASTERN DISTRICT OF MISSOURI 
 EASTERN DIVISION 

SHANTAE WINSTON, individually and ) 
on behalf of Carlton Bernard, deceased, ) 
 ) 
 Plaintiff, ) 
 ) 
v. ) Case No. 4:24-CV-1390-ZMB 
 ) 
CITY OF ST. LOUIS, MISSOURI, et al., ) 
 ) 
 Defendants. ) 

 MEMORANDUM AND ORDER 
 This matter is before the Court on Defendants City of St. Louis and Jennifer Clemons-
Abdullah’s (collectively, “the City Defendants”) Motion to Dismiss, Doc. 10, and Plaintiff Shantae 
Winston’s Motion for Leave to Amend Complaint, Doc. 26. Winston brought this civil-rights 
action against various jail officials, a medical provider, and the City after her son died from 
untreated dehydration and diabetes complications while in custody. Even after viewing the facts 
in the light most favorable to Winston, the Court finds that she failed to adequately plead a 
municipal-liability claim against the City or to establish that the City waived sovereign immunity 
as to her state-law tort claims. However, the course of proceedings indicate that Winston intended 
to sue Clemons-Abdullah in her individual capacity, not her official capacity, so the Court will not 
dismiss the claims against Clemons-Abdullah as duplicative of those against the City. 
Accordingly, the Court grants in part and denies in part the motion to dismiss. Finally, the Court 
grants Winston’s motion for leave to amend her complaint but will discuss amendment and related 
issues at an upcoming scheduling conference, which will be set by separate order. 
 BACKGROUND 
I. Factual Background1 
 Winston’s son, Carlton Bernard, was arrested and taken to the St. Louis City Justice Center 
in June 2023. Doc. 1 ¶¶ 2, 6, 20, 23. Two months later, on August 17, a guard found Bernard in 
his cell “lying down with vomit on himself and appear[ing] ‘very sick and frail.’” Id. ¶¶ 1, 36. The 
guard put out a “code three” alert for medical assistance. Id. Bernard’s blood-sugar readings were 
so high as to qualify as a serious medical emergency. Id. ¶¶ 1, 37–38. He also was visibly dehydrated. 
Id. ¶ 40. During Bernard’s visit to the infirmary, a nurse practitioner “diagnosed [him] as suffering 
from diabetes mellitus 2,” “prescribed [him] insulin to be administrated . . . twice daily,” and 
“noted that . . . he could die if his diabetes went untreated.” Id. ¶¶ 41–43. Bernard also received 5 
units of insulin at the infirmary. Id. ¶ 1. However, the nurse practitioner did nothing to treat his 
apparent dehydration or previously diagnosed schizophrenia, nor did she schedule a follow-up 
appointment to address any of Bernard’s medical issues. Id. ¶¶ 1, 45–49, 54–55. 

 The jail also did nothing to treat Bernard’s diabetes after he left the infirmary. Id. ¶ 73. 
Over the next few days, various nurses made rounds at Bernard’s housing unit, but none gave him 
insulin or addressed his obvious dehydration. Id. ¶¶ 50–80. The nurses claimed that Bernard refused 
treatment. Id. Yet he was incapable of doing so because his condition had deteriorated so badly. Id. 
 On August 20, a nurse noticed that “Bernard was lying on the floor and was not verbally 
responsive” but did nothing to help him. Id. ¶¶ 78–80. Like the other nurses, she also failed to 
administer insulin. Id. Shortly thereafter, other inmates alerted a guard that Bernard was struggling 
to catch his breath and needed an ambulance. Id. ¶¶ 80, 87–89. Bernard was taken to the hospital 
after some delay and was pronounced dead upon arrival. Id. ¶¶ 91–93. The cause of his death was 
“ketoacidosis due to diabetes mellitus and dehydration.” Id. ¶ 94. During just two months in jail, 
Bernard lost 33 pounds—a quarter of his body weight. Id. ¶¶ 2, 95–96. 

1 As required at this stage, the Court accepts as true the well-pled facts from the Complaint. See Doc. 1; infra at 4–5. 
 Winston alleges that the City and the jail’s medical provider had several unconstitutional 
customs and practices, which include: 
 1) not providing adequate medical care to detainees, 2) not providing or prescribing 
 medically necessary and/or prescribed medications to detainees, 3) mis-
 administering, maladministering, and/or failing to administer medically necessary 
 and/or prescribed medications, and 4) knowing their employees were falsifying 
 patient “refusals” of medication and routinely violating jail [] policies to cover-up 
 work their employees simply refused to do. 

Id. ¶ 109. To support this claim, she notes that the rate of inmate deaths had risen at the Justice Center 
before Bernard’s death—with 17 detainees dying between 2009 and 2019, while at least 15 detainees 
died from 2020 to 2023 (including 4 deaths in the last few months of 2023 alone). Id. ¶¶ 112–16. 
Winston also claims that the City “enacted inadequate policies and did not train, supervise and 
discipline its employees to ensure either existing policies were followed or ensure that [her son’s] 
needs were properly assessed, diagnosed, and addressed or treated.” Id. ¶¶ 111, 149, 153. 
II. Procedural Background 
 Winston brought this civil-rights action in October 2024. See Doc. 1. She advances six 
counts: three claims under 42 U.S.C. § 1983 and three related tort claims. Id. ¶¶ 125–97. Beyond 
the City Defendants, the Complaint identifies nine individual defendants along with John and Jane 
Does 1–5. Id. ¶¶ 6–19. 
 The City Defendants timely moved to dismiss. Doc. 10. They first contend that the claims 
against Clemons-Abdullah and the City are duplicative “[b]ecause [Winston] does not specify the 
capacity in which she is suing Commissioner Clemons-Abdullah, [so] it is presumed that she is 
sued in her official capacity only.” Doc. 11 at 1 n.1, 3. The City Defendants also argue that the 
Complaint fails to state a viable municipal-liability claim, and they assert sovereign immunity as 
to the state-law claims. Id. at 2. In response, Winston insists the municipal-liability claims were 
properly pled but concedes the tort claims against the City should be dismissed without prejudice. 
Doc. 13 at 11–14. She further clarifies that her intention was to sue Clemons-Abdullah in her 
individual capacity and “seek[s] leave to file an amended complaint or simply interlin[eate] [the] 
individual capacity into [her] original complaint.” Id. at 14. The City Defendants oppose this 
request, arguing the amendment by interlineation is “improper under Federal Rule of Civil 
Procedure 15 . . . and prejudices Defendants, insofar as it would prevent them from responding to 
previously unpled allegations against Clemons-Abdullah in her individual capacity.” Doc. 14 at 1. 
 Months later, Winston moved for leave to file an amended complaint. Doc. 26. Winston 
states that she “unintentionally omitted . . . Clemons-Abdullah[] from the ‘parties’ section of her 
complaint which also should have stated she was being sued in her individual capacity.” Id. ¶ 2. 
In addition, the proposed amended complaint adds information about a jail contractor, references 
an article from November 2024 about detainee deaths at the Justice Center, and specifies the 
damages she demands. Doc. 26-2 ¶¶ 11–12, 116; id. at 36. Winston also indicates that “all 
defendants have consented to this motion except St. Louis [] and [] Clemons-Abdullah.” Doc. 26 
¶ 7. However, the City Defendants never filed a response in opposition to the motion, and their 

time to do so has long since passed. See E.D. MO. L.R. 4.01(B). 
 LEGAL STANDARD 
I. Motion to Dismiss 
 Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss for 
“failure to state a claim upon which relief can be granted.” The purpose of such motions “is to test 
the legal sufficiency of the complaint.” Ford v. R.J. Reynolds Tobacco Co., 553 F. Supp. 3d 693, 
697 (E.D. Mo. 2021). To survive a Rule 12(b)(6) motion, the complaint must include “a short and 
plain statement of the claim showing that the [plaintiff] is entitled to relief” and providing notice 
of the grounds on which the claim rests. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) 
(quoting FED. R. CIV. P. 8(a)(2)). Additionally, the complaint must include sufficient detail to make 
a claim “plausible on its face.” Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted). 
Although “[s]pecific facts are not necessary,” the plaintiff must include “either direct or inferential 
allegations respecting all the material elements necessary to sustain recovery under some viable 
legal theory.” Delker v. MasterCard Int’l, 21 F.4th 1019, 1024 (8th Cir. 2022) (quotations 
omitted). The question is not whether the plaintiff will ultimately prevail, but whether the plaintiff 
is entitled to present evidence in support of the claim. Id. 
 At the motion-to-dismiss stage, the Court must accept as true the factual allegations in the 
complaint and draw all reasonable inferences in the plaintiff’s favor. See Brokken v. Hennepin 
Cnty., 140 F.4th 445, 450 (8th Cir. 2025) (citation omitted). However, the Court does not “presume 
the truth of legal conclusions.” Jones v. City of St. Louis, 104 F.4th 1043, 1046 (8th Cir. 2024) 
(citation omitted); see also Kulkay v. Roy, 847 F.3d 637, 641 (8th Cir. 2017) (“[T]he court is free 
to ignore legal conclusions, unsupported conclusions, unwarranted inferences and sweeping legal 

conclusions cast in the form of factual allegations.”). Ultimately, this analysis is “a context-specific 
task that requires the reviewing court to draw on its judicial experience and common sense.”
Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 594 (8th Cir. 2009). 
II. Municipal Liability 
 Cities may be subject to municipal liability for civil-rights claims under section 1983, but 
they bear responsibility only for their own conduct and not that of their employees. Soltesz v. 
Rushmore Plaza Civic Ctr., 847 F.3d 941, 947 (8th Cir. 2017) (citing Monell v. Dep’t of Soc. 
Servs., 436 U.S. 658, 690–91 (1978)). Accordingly, “[t]he Supreme Court has set a high bar” for 
such claims, requiring “careful analysis . . . to avoid any risk that liability could be imposed under a 
theory of respondeat superior.” Id. (citation omitted). “[Section] 1983 liability . . . may attach to a 
municipality if the violation resulted from (1) an official municipal policy, . . . (2) an unofficial 
custom, . . . or (3) a deliberately indifferent failure to train or supervise.” Watkins v. City of St. Louis, 
102 F.4th 947, 953 (8th Cir. 2024) (citation omitted). Further, the plaintiff “must prove that a 
municipal policy or custom was the moving force behind the constitutional violation.” Id. 
(quotations omitted). The same is true for an alleged failure to train or supervise. See Doe v. Fort 
Zumwalt R-II Sch. Dist., 920 F.3d 1184, 1189 (8th Cir. 2019). 
 DISCUSSION 
 The City Defendants advance three grounds for dismissal: (1) the claims against Clemons-
Abdullah are duplicative of the claims against the City, (2) Winston fails to state a claim of 
municipal liability against the City, and (3) the City is entitled to sovereign immunity as to the 
state-law tort claims. Doc. 11 at 1–2. In light of intervening precedent, it is clear from the course 

of proceedings that Winston intended to sue Clemons-Abdullah in her individual capacity, so the 
claims against her and the City are not duplicative. However, Winston failed to adequately plead 
a municipal-liability claim against the City and similarly did not establish that the City waived 
sovereign immunity as to her tort claims. Finally, the Court grants Winston’s unopposed motion 
for leave to amend her complaint and will confer with the parties about the timing and scope of 
those amendments at an upcoming scheduling conference. 
I. Claims Against Clemons-Abdullah (Counts II, IV, VI) 
 The City Defendants first assert that the claims against Clemons-Abdullah should be 
dismissed as “redundant of the claims against the City.” Doc. 11 at 2. This argument is premised 

on the assumption that Winston raised only official-capacity claims given her failure to “specify 
the capacity in which she is suing [] Clemons-Abdullah.” Id. at 1 n.1. For her part, Winston insists 
that “[she] did not sue Defendant Clemons-Abdullah in her official capacity” and that she intends 
to pursue only individual-capacity claims. Doc. 13 at 14. But what really matters in resolving this 
issue is an intervening change in applicable precedent. 
 When the City Defendants filed their motion to dismiss, the prevailing standard was “a 
bright-line rule that [i]f a plaintiff’s complaint is silent about the capacity in which she is suing the 
defendant, [the court must] interpret the complaint as including only official-capacity claims.” 
S.A.A. v. Geisler, 127 F.4th 1133, 1136 (8th Cir. 2025) (en banc) (quotation omitted). However, 
the Eighth Circuit recently “reject[ed] the clear statement rule in favor of the course of proceedings 
test for determining the capacity in which a § 1983 defendant is sued.” Id. at 1138. “Relevant 
factors include, but are not limited to, how early in the litigation the plaintiff first specified 
individual capacity claims, whether the plaintiff’s complaint included a prayer for punitive 
damages, and whether the defendant declined to raise a qualified immunity defense.” Id. at 1139. 

 Here, the course of proceedings confirm that Winston intended to sue Clemons-Abdullah 
in her individual capacity. Significantly, Winston’s clarification regarding capacity “in response 
to [the] motion to dismiss was early enough to be given weight.” See id. at 1139–40 (citation 
omitted). The Complaint also seeks punitive damages in each of the counts against Clemons-
Abdullah, and Count III specifically demands “punitive damages against each individual 
Defendant, in his or her individual capacity.” Doc. 1 ¶¶ 162, 177, 194. Because “[p]unitive 
damages are not available against government officials sued in an official capacity, [this fact] 
suggests an intent to sue the official in her individual capacity.” See Geisler, 127 F.4th at 1140 
(citation omitted). Additionally, Winston names the City and Clemons-Abdullah as separate 

defendants, which is further evidence of an individual-capacity claim. See Adaway v. Precythe, 
No. 4:23-CV-1660-SPM, 2025 WL 1078586, at *2 (E.D. Mo. Apr. 9, 2025). And while Clemons-
Abdullah did not assert qualified immunity—suggesting she was not “on notice of the potential 
for personal liability”—the Eighth Circuit has emphasized that “no single factor is dispositive in 
an assessment of the course of proceedings.” See Geisler, 127 F.4th at 1140 (quotation omitted). 
 In sum, because the individual-capacity claims against Clemons-Abdullah are not 
duplicative of the claims against the City, the Court declines to dismiss the counts against her. 
However, given the intervening precedent, the Court will consider allowing Clemons-Abdullah to 
amend her response to the complaint at the upcoming scheduling conference. Doc. 14 at 1. 
II. Municipal-Liability Claims against the City (Counts II–III) 
 The City Defendants also move to dismiss the Monell claims against the City. Winston 
brings two such claims, alleging: (1) an unconstitutional pattern, practice, and custom of 
withholding medical care from Justice Center detainees, and (2) a failure to train and supervise 
Justice Center staff and medical providers. Doc. 1 ¶¶ 139–171. Even after viewing the Complaint 

in the light most favorable to Winston, the Court finds that she failed to adequately plead either an 
unconstitutional-custom or failure-to-supervise claim. 
 a. Unconstitutional Pattern, Practice, or Custom 
 The City Defendants contend that the Complaint does not establish an unconstitutional custom 
because Winston failed to cite “prior instances of misconduct[] sufficiently numerous and specific 
enough to demonstrate that City officials had a pattern or practice of unconstitutional misbehavior” or 
sufficient notice. Doc. 11 at 8. Winston counters that she provided ample instances of misconduct, 
having pled that “a total of [32] detainees died between 2009 and [2023]” as a result of withheld 
medical care. Doc. 13 at 10. But Winston falls short of pleading an unconstitutional custom or notice 

to policymakers after excluding the fatalities that are too far removed to support her claim. 
 To establish an unconstitutional custom, Winston must show: 
 1) [t]he existence of a continuing, widespread, persistent pattern of unconstitutional 
 misconduct by the [City] employees; 2) [d]eliberate indifference to or tacit authorization 
 of such conduct by [City] policymaking officials after notice to the officials of that 
 misconduct; and 3) [t]hat [she] was injured by acts pursuant to the [City’s] custom, 
 i.e., that the custom was a moving force behind the constitutional violation. 

Johnson v. Douglas Cnty. Med. Dep’t, 725 F.3d 825, 828 (8th Cir. 2013) (citations omitted). At this stage, 
Winston “need not prove each of these three prongs, but [she] must allege enough facts about each 
element of the claim to raise a right of relief above a speculative level.” Jackson v. City of Maplewood, 
No. 4:24-CV-1207-NCC, 2025 WL 2299393, at *7 (E.D. Mo. Aug. 7, 2025) (citation omitted). 
 For a pattern of unconstitutional conduct to qualify for Monell liability, it “must be so 
pervasive and widespread so as to have the effect and force of law.” Brewington v. Keener, 902 
F.3d 796, 801 (8th Cir. 2018) (quotation omitted); see also Davis v. City of St. Louis (Davis I), No. 
4:22-CV-902-SEP, 2023 WL 4684510, at *4 (E.D. Mo. July 21, 2023) (“A pattern requires 
similarity and specificity through sufficiently numerous prior incidents as opposed to isolated 
instances’ that ‘point to the specific violation in question.’” (quotation omitted)). “The Eighth 

Circuit has not directly addressed the quantum of ‘continuing, widespread, persistent’ conduct a 
plaintiff must allege to satisfy the Iqbal standard in this context, though it has held that isolated 
incidents do not suffice and that allegations of ‘many’ incidents do establish liability.” Ball-Bey v. 
Chandler, 415 F. Supp. 3d 884, 895 (E.D. Mo. 2019) (citations omitted). Likewise, the Fifth 
Circuit has required that the prior misconduct “occurred for so long or so frequently that the course 
of conduct warrants the attribution to the governing body of knowledge that the objectionable 
conduct is the expected, accepted practice of [the municipality’s] employees.’” Burbridge v. City 
of St. Louis, 430 F. Supp. 3d 595, 620 (E.D. Mo. 2019) (collecting cases). 
 Winston relies on newspaper articles and interest-group reports to show that the fatality rate 
at the Justice Center had increased around the time of Bernard’s death—both to establish a pattern 
of inadequate medical care and to suggest that policymakers were on notice of this misconduct. 
Doc. 1 ¶¶ 112–116. Specifically, the Complaint states that 17 inmates died from 2009 to 2019, while 
almost the same number—15 inmates—died between 2020 and 2023. Id. ¶¶ 112–114. There were 

also four inmate deaths between August and December 2023. Id. ¶ 112. The Complaint gives no 
details about the earlier fatalities but alleges that withheld medical care caused the more-recent deaths.2 

2 In her response to the motion to dismiss, Winston suggests that the deaths from 2009 to 2019 were part of a broader 
pattern of “constitutional failures,” see Doc. 13 at 10, but her Complaint attributes “denied and/or delayed adequate 
medical care” as the cause of death for only those inmates who died from 2020 to 2023, see Doc. 1 ¶¶ 112, 114. Thus, 
while the earlier fatalities may show that the rate of death had risen at the Justice Center, see id. ¶ 116, they cannot be 
considered in assessing a purported pattern or notice to policymakers—at least as currently pled. 
 However, these figures are far less compelling upon closer examination—even after giving 
Winston every reasonable benefit of the doubt. For starters, the mortality data from 2020 to 2023 
includes Bernard and at least one inmate who died after him. See id. ¶¶ 1, 115; Doc. 11-2. At a 
minimum, neither death counts for purposes of deliberate indifference. See Davis v. City of St. Louis 
(Davis II), No. 4:22-CV-902-ZMB, 2026 WL 24995, at *4–5 (E.D. Mo. Jan. 5, 2026) (declining to 

consider after-the-fact findings of misconduct). Similarly, a newspaper article cited in the Complaint 
further undercuts these statistics by revealing that “the majority of 15 deaths at the jail since 2020 
[were] from natural causes or accidental overdoses” and that four others were suicides.3 Doc. 11-1 
at 2. As such, the bulk of these fatalities must be excluded given their dissimilarity with Bernard’s 
death and because it would require more than a reasonable inference to connect the dots between 
withheld medication and death by natural causes, suicide, or even accidental overdose (at least 
without additional allegations). See Davis I, 2023 WL 4684510, at *4 (“A pattern requires similarity 
and specificity . . . .”). Assuming that deficient treatment caused the remaining deaths, Winston has 
identified only two other relevant fatalities over a 44-month period.4 Finally, the Complaint offers 

no reference point or other information necessary to evaluate the data, such as the comparable 
mortality rate at other facilities or even the number of detainees at the Justice Center.5 

3 “In the event there are any clear inconsistencies between an allegation in the [] Complaint and a document embraced 
by the [] Complaint, the document controls.” Holmbeck v. Solomon, 639 F. Supp. 3d 829, 833 n.2 (E.D. Ark. 2022) (citing 
Zean v. Fairview Health Servs., 858 F.3d 520, 526 (8th Cir. 2017)). In other words, “[c]ourts need not accept as true 
factual assertions that are contradicted by . . . by documents upon which the pleadings rely.” Williams v. First Nat. Bank, 
No. 4:14-CV-1458-ERW, 2014 WL 5800199, at *4 (E.D. Mo. Nov. 7, 2014). 

4 Starting with 15 deaths from January 2020 to August 2023, subtract Bernard’s death, 8 deaths from “natural causes 
or accidental overdoses,” and 4 suicides (includes the inmate who died after Bernard), for a total of 2 fatalities. 

5 Winston’s failure to provide this context may itself preclude a prima facie case. See Ball-Bey, 415 F. Supp. 3d at 896 
(dismissing an unconstitutional-custom claim for excessive force, in part, because the Complaint “failed to allege the 
population of the City, the number of officers on the SLMPD, the number of stops made or encounters involving 
SLMPD officers . . . or other publicly-available data from which the Court could ‘infer more than the mere possibility 
of misconduct.’”) (citation omitted); Davis I, 2023 WL 4684510, at *4 (same where the plaintiff provided “no context 
or specifics relating the cited data” and, therefore, had not shown more than a “mere possibility of misconduct.”). 
 Even with the overdose deaths included (i.e., 9 deaths in 44 months, or 2.5 per year), it 
would be a close call as to whether Winston had identified a pattern “so pervasive and widespread 
so as to have the effect and force of law.” See Brewington, 902 F.3d at 801. Indeed, this Court has 
rejected unconstitutional-custom claims involving similar incident rates. See, e.g., Ball-Bey, 415 
F. Supp. 3d at 896 (finding “that fewer than 2.5 instances [of excessive use of force] per year over 

a six-year period” did not constitute a pattern or practice); Burbridge, 430 F. Supp. 3d at 620–21 
(concluding that “two or three” instances of unconstitutional conduct a year apart does not 
establish a custom); see also Davis II, 2026 WL 24995, at *4 n.5 (collecting cases). But assuming 
Winston could show a pattern of misconduct, she still comes up short on the deliberate-indifference 
prong. Critically, while the Complaint mentions “notice” several times with respect to the City, 
only one allegation comes close to meeting this requirement: Winston’s assertion that prior “deaths 
were reported publicly and/or by media and demonstrate that the city jail and staff were on notice 
that not only the quantity of jail deaths was increasing, but also . . . accelerat[ing].”6 Doc. 1 ¶ 116. 
But as the City correctly notes, see Doc. 11 at 6, this paragraph alleges only that the “deaths were 

reported,” not that the media attributed the deaths to inadequate treatment—indeed, the articles 
cited in the Complaint did not even hint at this issue, see Doc. 11-1; Doc. 11-2. Accordingly, 
because Winston failed to adequately plead that City policymakers were on notice of an 
unconstitutional custom, the Court must dismiss this claim. 

6 Almost all other references are conclusory. See Doc. 1 ¶¶ 2, 110, 112. The only exception is Winston’s claim that 
the City was “specifically on notice of the individual defendant’s pattern and practice of delaying and delaying 
adequate medical care, including related to Defendants Schneider and Wilke.” Id. ¶ 110. But the earliest instance of 
inadequate care in the Complaint was on August 17, 2023—three days before Bernard’s death. That incident is “simply 
too close in time to . . . show ‘deliberate indifference’ or ‘tacit authorization.’” See Burbridge, 430 F. Supp. 3d at 620. 
 b. Failure to Train or Supervise 
 Winston’s failure-to-supervise claim meets the same fate. In addition to highlighting 
similar notice problems, the City Defendants argue that Winston failed to specify the relevant 
training and supervisory procedures and explain how they were deficient. Doc. 11 at 6–7; see also 
Doc. 14 at 4. In response, Winston simply suggests that the City was required “to properly train 
and supervise its employees regarding . . . [the] duty to provide appropriate medical care 
to . . . detainees confined to its jail,” without even mentioning her Complaint—perhaps because its 
allegations are plainly insufficient as to this claim. Doc. 13 at 11–12. 

 A failure to train or supervise is the most difficult municipal-liability claim to make because, 
“[i]n virtually every instance where a person has [allegedly] had his or her constitutional rights 
violated by a city employee, a § 1983 plaintiff will be able to point to something the [City] ‘could 
have done’ to prevent the unfortunate incident.” Mendoza v. ICE, 849 F.3d 408, 420 (8th Cir. 
2017) (citation omitted). Establishing this claim requires Winston to plead facts sufficient to show 
that: (1) the City’s “training practices were inadequate”; (2) the City was “deliberately indifferent 
to the rights of others in adopting these training practices, and its failure to train was a result of 
deliberate and conscious choices it made”; and (3) the City’s “alleged training deficiencies caused 
[the] constitutional deprivation.” See Ulrich v. Pope Cnty., 715 F.3d 1054, 1061 (8th Cir. 2013). 
“Under § 1983 a claim for failure to supervise requires the same analysis as a claim for failure to train.” 
Atkinson v. City of Mountain View, 709 F.3d 1201, 1216–17 (8th Cir. 2013) (quotation omitted). 
 Winston’s allegations about the City’s failures to train and supervise are almost entirely 
conclusory. For example, the Complaint states that the City was “on notice of their failures to train, 
supervise and discipline their agents and employees” and that it did not fix these deficiencies “to 
ensure either existing policies were followed or ensure that Mr. Bernard’s needs were properly 
assessed, diagnosed, and addressed or treated.” Doc. 1 ¶¶ 110–11; see also id. ¶¶ 149, 153 (making 
further conclusory allegations). Absent further detail, these allegations are simply legal 
conclusions that “lack[] the factual enhancement necessary to withstand dismissal.” McNealy v. 
City of St. Louis, No. 4:24-CV-583-JAR, 2024 WL 4817299, at *10 (E.D. Mo. Nov. 18, 2024). 
And once these conclusory allegations are stripped away, it is clear that Winston failed to plead 
the required elements. Even beyond similar notice deficiencies to those discussed above, Winston 
does not identify the relevant training or supervisory deficiencies, such as information about “the 
jail’s current training plan, how that training compares to the training at other jails, or a single 
specific instance of the staff failing to recognize a[] [different] inmate’s serious medical 
condition.” See Miller ex rel. Rippeto v. City of St. Louis, No. 4:23-CV-307-SEP, 2024 WL 
1366797, at *5 (E.D. Mo. Mar. 31, 2024); see also Davis I, 2023 WL 4684510, at *5 (dismissing 
a failure to train claim where the complaint failed to “include any facts about” the relevant entity’s 
“training program”).7 Additionally, while not raised by the City Defendants, the Complaint’s 
failure to allege causation between the deficient training and supervision and the harm to Bernard 
in a non-conclusory manner is independently fatal. See Ware v. Jordan, No. 2:24-CV-48-ZMB, 
2026 WL 171689, at *5 (E.D. Mo. Jan. 22, 2026). As a result, this claim also must be dismissed. 
III. Tort Claims against the City (Counts IV, VI) 
 The City Defendants also argue that Winston’s tort claims do not “fall within the narrow 
exceptions to sovereign immunity” under Missouri law. Doc. 11 at 9–10. Winston does not dispute 
this point and instead asks the Court “to dismiss the [Counts] IV and VI against the City of St. 
Louis without prejudice so that [she] may, after discovery is conducted, amend her complaint and 
assert an exception to sovereign immunity.” Doc. 13 at 14. “Sovereign immunity is not an 
affirmative defense but is part of the plaintiff’s prima facie case,” which requires pleading an 
exception to immunity. See Fernandez v. St. Louis Cnty., 538 F. Supp. 3d 888, 903–04 (E.D. Mo. 
2021) (citations omitted). Because Winston admits she has failed to do so, the Court dismisses the 
tort claims against the City. Winston’s request for leave to amend her complaint after the 
conclusion of discovery will be discussed at the upcoming scheduling conference. 

7 The closest Winston comes to identifying relevant deficiencies is her allegation that “[the] City failed to train, 
supervise, and discipline its correctional officer defendants to ensure that correctional officers within the jail responded 
appropriately to urgent medical situations.” Doc. 1 ¶ 153. But these claims still lack necessary detail, unlike the more 
specific assertions that Winston has pled against other defendants. See, e.g., Id. ¶¶ 150–52. 
IV. Motion for Leave to Amend 
 Finally, as noted above, Winston has a pending motion for leave to amend her complaint. 
Doc. 26. All defendants consent to this request except the City Defendants, who have not responded. 
Id. Given the liberal standard for amendment under Federal Rule of Civil Procedure 15(b) and the 
lack of opposition, the Court grants Winston’s request to amend her complaint. See Thompson-El 
v. Jones, 876 F.2d 66, 67 (8th Cir. 1989) (“[A]bsent a good reason for denial—such as undue 
delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously 
allowed, undue prejudice to the non-moving party, or futility of amendment—leave to amend 
should be granted.”). However, the proposed amended complaint names at least one party who has 
been dismissed, arguably suffers from some of the same deficiencies as the original pleading, and 
raises potential scheduling issues. See Docs. 26-2, 32. As such, the Court will give Winston the 
opportunity to revise her proposed amended complaint after conferring with parties regarding the 
scope and timing of any amendments at the upcoming scheduling conference. 
 CONCLUSION 
 Accordingly, the Court GRANTS IN PART and DENIES IN PART Defendants City of 
St. Louis and Jennifer Clemons-Abdullah’s [10] Motion to Dismiss and dismisses only the claims 
against the City without prejudice. Further, the Court GRANTS Plaintiff Shantae Winston’s [26] 
motion for leave to amend her complaint and will address the scope and timing of any amendment 
at an upcoming scheduling conference, which will be set by a separate order. 
 So ordered this 23rd day of February 2026. 
 Cte Shr 
 ZACHARY M.BLUESTONE 
 UNITED STATES DISTRICT JUDGE 

 14